**Starlet L. PEGUMP, Plaintiff,**

v.

**ROCKWELL INTERNATIONAL CORPORATION, Local 1634 International Brotherhood of Electrical Workers, Local Union 1634, Defendants.**

Civil No. 3–94–CV–30187.

United States District Court, S.D. Iowa, Davenport Division.

March 7, 1996.

Wallace L. Taylor, Cedar Rapids, IA, William A. Price, Price Law Firm, Des Moines, IA, for Starlet L. Pegump.

Wilford H. Stone, Lynch Dallas Smith & Harman, Cedar Rapids, IA, for Rockwell Intern. Corp.

Kay M. Johansen, Cedar Rapids, IA, for Local 1634 Intern. Broth. of Elec. Workers, Local Union 1634.

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

WALTERS, United States Magistrate Judge.

This matter is before the Court on Defendants' motions for summary judgment. On October 17, 1994 Plaintiff Starlet Pegump filed a state court petition against defendant Rockwell International Corporation ("Rockwell") and defendant Local 1634 International Brotherhood of Electrical Workers ("Union") in the Iowa District Court for Johnson County asserting claims under the federal Labor Management Relations Act ("LMRA"). Defendants removed the case from state court to this Court on November 15, 1994.[1] Jurisdiction is predicated on 28 U.S.C. section 1441 and 29 U.S.C. section 185. The parties consented to proceed before a United States Magistrate Judge and the case was assigned to the undersigned on April 7, 1995. *See* 28 U.S.C. § 636(c).

On September 14, 1995, defendant Rockwell filed a motion for summary judgment. In support of its motion Rockwell filed a statement of undisputed material facts, a brief, and a record of exhibits. Rockwell's motion asserts that as a matter of law its suspension of Plaintiff and request for medical evaluation following an incident where Plaintiff allegedly threatened violence against other employees did not constitute a breach of the collective bargaining agreement ("CBA"). Rockwell further asserts the Union's actions in representing Plaintiff did not constitute a breach of the Union's duty of fair representation.

On October 16, 1995, Plaintiff filed a resistance to Rockwell's motion, a brief, and a record of exhibits in support of the resistance. Plaintiff subsequently filed a statement of disputed facts.[2] Plaintiff contends Rockwell is not entitled to summary judgment because issues of fact remain as to both claims. Specifically, she urges that (1) Defendants ignored the fact she denied making the alleged threats; (2) the Union failed to take appropriate action to investigate the incident and to process a grievance on her behalf; and (3) Rockwell did not have the authority to demand a medical evaluation and release of records before processing her grievance. Rockwell later filed a reply brief to Plaintiff's resistance; Plaintiff also filed a response to the reply brief.

On October 19, 1995, Defendant Union filed a motion for summary judgment on the grounds that (1) its actions did not breach the duty of fair representation, and (2) Plaintiff has failed to exhaust her remedies under the CBA. In support of its motion the Union also filed a statement of undisputed facts, a brief, and a record of exhibits. The Union's arguments are substantially similar to those set forth in Rockwell's filings. On November 28, 1995 Plaintiff filed a resistance to the Union's motion incorporating her prior submissions.

Hearing on the above motions was held on December 1, 1995. At the hearing defendant Rockwell was represented by Wilford Stone and defendant Union was represented by Kay Johansen. Plaintiff was represented by

---

**1.** Rockwell also filed a cross-claim against defendant Union for contribution and indemnity on November 22, 1994.

**2.** The Court's consideration of the motions has been complicated by the fact that Plaintiff did not, as required by Local Rule 14(h), include in her statement "specific references to those parts of the pleadings, depositions, answers to interrogatories, admissions, and affidavits" which support her contentions.

Wallace Taylor. The motion is fully submitted.

## I.

Defendants' motions for summary judgment are subject to the following well-established standards. A party is entitled to summary judgment only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990) (citing Fed.R.Civ.P. 56(c)); *accord Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538, 552–53 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986)).

The moving party has the burden of asserting that the nonmoving party is without evidence to support a crucial element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273–74 (1986). Rule 56 does not require the moving party to support its motion with affidavits or other similar materials negating the opponent's claim. The nonmoving party must present admissible evidence sufficient to withstand the motion for summary judgment. *Id.* at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274–75. The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 212 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the

material facts" and "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (quoting Fed.R.Civ.P. 56(e)) (emphasis omitted); *see also Teleconnect Company v. Ensrud*, 55 F.3d 357, 360 (8th Cir.1995).

In assessing a motion for summary judgment a court must determine whether a fairminded jury could reasonably return a verdict for the nonmoving party based on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. The court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 552–53; *accord Munz*, 28 F.3d at 796; *Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir.1993). The court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue meriting a trial. *Grossman v. Dillard Dep't Stores, Inc.*, 47 F.3d 969, 971 (8th Cir.1995); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). A conflict between the parties' evidence ordinarily indicates a question of fact to be resolved by the jury. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983).

In deciding a motion for summary judgment care should be exercised to avoid taking genuine factual issues from juries. *Wabun–Inini*, 900 F.2d at 1238. Thus, "[s]ummary judgment 'should not be entered unless the movant has established its right to a judgment with such clarity as to leave no room for controversy and unless the other party is not entitled to recover under any discernable circumstances.'" *Teleconnect Company*, 55 F.3d at 359 (quoting *Kegel v. Runnels*, 793 F.2d 924, 927 (8th Cir.1986)). Summary judgment, however, is not a disfavored procedural shortcut, but rather one designed to "secure the just, speedy, and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S. Ct. at 2555, 91 L.Ed.2d at 276; *see also Hartnagel*, 953 F.2d at 396; *Wabun–Inini*, 900 F.2d at 1238.

## II.

### A. Undisputed Facts

The following facts appear to be undisputed. Plaintiff Starlet Pegump began working at defendant Rockwell's manufacturing facility in Coralville, Iowa on August 22, 1988. At the time of her suspension Plaintiff held the position of assembly operator in the postcoat department.[3] Defendant Union is a labor union representing employees at the Rockwell plant.

Plaintiff's employment during the relevant period was governed by a CBA between Rockwell and the Union. *See* Rockwell Exhibit B, at 1–18.[4] Plaintiff understood she was a bargaining unit employee at Rockwell. For the purpose of collective bargaining Rockwell recognizes the Union as the exclusive representative of its production employees. *Id.* at 1. Under the CBA the Union Business Manager, Chief Stewards, and Stewards represent the employees. *Id.* at 3. Article VII of the CBA sets forth the following complaint and arbitration procedures:

STEP 1. Within three (3) normally scheduled working days of any action causing an alleged complaint, or within three (3) normally scheduled working days of the alleged complaint becoming known to the employee or the UNION, an employee can present the complaint verbally to his/her facilitator. The employee will be accompanied by their Union Steward. The facilitator will render an answer within two (2) normally scheduled working days.

STEP 2. If a satisfactory settlement is not reached during Step 1 of this procedure, the Steward, within two (2) working days of the first step answer, can present the alleged complaint to the next level of management for resolution. The next level of management must render an answer within two (2) working days.

STEP 3. If a satisfactory settlement is not reached during Step 2 of this procedure, the Steward, within two (2) working days, must reduce the complaint to written grievance form and present the grievance to the Plant Manager. The Plant Manager has three (3) working days during which to render an answer.

STEP 4. If a satisfactory settlement is not reached during Step 3 of this procedure, either party can, within three (3) additional working days, appeal to the other party for arbitration of the grievance. Arbitration under this Agreement shall be applied only to the interpretation, application of the provisions of the Agreement, and any disciplinary action. . . .

*Id.* at 4.

The employee handbook sets forth a list of general plant rules. *See* Rockwell Exhibit D. Plaintiff reviewed the employee handbook and signed an employee agreement incorporating the handbook. Rockwell Exhibit P. Violation of a major rule may result in termination of employment. Major offenses include, among other acts, "unsafe acts which endanger life or property" and "insubordination." *Id.* at 1. The list of major offenses is "not all inclusive." *Id.* "Any behavior which is disruptive to productivity or offensive to other employees" may result in corrective action. *Id.* at 2. The handbook provides that Rockwell has an "open door policy" encouraging "open and direct communications between all individuals." *Id.* at A–9. In addition, Article X of the CBA provides employees may be discharged for "just cause." Exhibit B, at 13.

Plaintiff's complaint arises from an incident which took place at the Rockwell plant on August 12, 1994. At approximately 6:30 a.m. that morning Rockwell production employees Dona MacMillan and Cris Bolton–Severson claim they overheard Plaintiff make the following statements to Deb Hofer, Plaintiff's coworker and friend:

Do you know what I should do? I should bring a gun in here and if I did, I don't know if I would start at the front door with Mike Bell or Kevin, or if I came in the

---

3. The job description and schedule of benefits for this position is included in Rockwell's record of exhibits following a copy of the CBA. Exhibit B, at 19–30.

4. The CBA was effective May 1, 1992 through April 30, 1995.

back door, I'm not sure who I would start with.[5]

Deposition Testimony of Dona MacMillan, at 10–13 [hereinafter MacMillan Tr.]; *see also* Affidavit of Cris Bolton–Severson, at 1 [hereinafter Bolton–Severson Aff.]. They did not hear any conversation between Plaintiff and Hofer prior to the above statements. MacMillan Tr., at 13. MacMillan made notes about the conversation. *Id.* at 21. Neither person had heard Plaintiff previously mention violent acts or make threats.

The alleged threats were not reported to other employees or Rockwell staff until August 25, 1994. *Id.* at 18; Bolton–Severson Aff., at 2. Bolton–Severson states that the threats upset them and after discussing it with MacMillan and several family members in the following days she decided to report the incident to their team leader and facilitator JoAnne Webb. Bolton–Severson Aff., at 2. Webb confirmed the information from Bolton–Severson with MacMillan before reporting it to the front office that same day. MacMillan Tr., at 22.

Upon learning of the threat incident on August 25 Mike Bell contacted Doug Hansel, Facility Security Officer, at the Cedar Rapids Rockwell facility. Deposition Testimony of J. Douglas Hansel, at 6–7 [hereinafter Hansel Tr.]. Hansel immediately drove to Coralville and met with Mike Bell and Webb. *Id.* at 7–8. Hansel then separately interviewed Bolton–Severson and MacMillan about the August 12 conversation between Plaintiff and Hofer. *Id.* at 8–9; MacMillan Tr., at 22–23. Gerrie Campbell, Human Resource representative, was present with Hansel and kept notes during the employee interviews. Rockwell Exhibit Q (Affidavit of Gerrie Campbell). Shortly thereafter Campbell typed her interview notes in summary form. *Id.* (attached to Campbell Aff.). Campbell's notes encompass interviews with Cris Bolton–Severson, Dona MacMillan, Deb Hofer, Michelle Burns, and plaintiff Starlet Pegump. Exhibit Q, at 3–7; Response to Plaintiff's Request for Production of Documents No. 2 [hereinafter RFP No. 2].[6] The summary judgment record does not call into question the accuracy of Campbell's notes with respect to interviews of Bolton–Severson, Mac-Millan, or Burns.[7]

Hansel spoke with Bolton–Severson first. From Campbell's notes it appears she related the same conversation as detailed above. Exhibit Q, at 5; Bolton–Severson Aff. She also gave Hansel background information on Plaintiff and her opinion of Plaintiff's attitude and behavior at work. Hansel met with MacMillan next. MacMillan Tr., at 22–23. She related the same version of the incident. RFP No. 2, at 4. The Union's business manager and president, Moustapha Kassem, was not present at either of these interviews. Deposition Testimony of Moustapha Kassem, at 19–22 [hereinafter Kassem Tr.].

Hansel called Kassem to the office after he had spoken with MacMillan and Bolton–Severson. Kassem Tr., at 19–22. Hansel explained the reason for the meeting in the presence of both employees. *Id.* Kassem briefly asked them if what Hansel had related was what they had said. *Id.* at 21–22. Hansel then indicated he was going to talk to other employees and Ms. Pegump. *Id.* at 23. Deb Hofer was called to the office next. *Id.* at 23–24. After Hansel explained the reason for the meeting Kassem took Hofer out of the room and generally advised her to tell the truth and to stop or ask questions if she had any concerns. *Id.* at 24–26.

Campbell's notes reflect that Hofer hesitated in answering Hansel's direct question about whether Star Pegump had actually made the threatening statements as alleged. Exhibit Q, at 6. It appears she responded to the effect that she thought Star was joking when she said it. *Id.* She also stated she had told Star it was not a smart thing to say.

---

**5.** At that time Mike Bell was the Human Resource Manager and Kevin McCarthy was the Production Manager at Rockwell.

**6.** Gerrie Campbell's notes of Hansel's interviews of MacMillan and Burns are omitted from Rockwell's record of exhibits, but are included in the Union's record of exhibits.

**7.** In her statement of disputed facts Plaintiff "denies that the summaries of the interviews conducted by J.D. Hansel are accurate and complete." The Court notes there is no sworn statement in the record supporting this contention. Fed.R.Civ.P. 56(e).

Hofer told Hansel Star was taking medicine for depression but she was not on medication on the date in question. *Id.; see also* Kassem Tr., at 30–32. Although Hofer mentioned there were some problems in the post-coat department involving certain employees and JoAnne Webb, she did not know of any specific problems with Mike or Kevin and did not believe Star was at all serious. Exhibit Q, at 6–7. Hofer told Hansel Star was her best friend. *Id.* at 7. In a deposition given several months later Hofer confirmed that Campbell was present and taking notes during her interview. Deposition Testimony of Deb Hofer, at 18, 41 [hereinafter Hofer Tr.]. Hofer indicated she did not doubt the accuracy of Campbell's interview notes. *Id.* at 18.

Hansel also interviewed Michelle Burns, an employee working in Plaintiff's area. RFP No. 2, at 7 (Union Record). Burns was not aware of the threat incident and she had not heard Star make any threats. *Id.* Burns also gave her opinion of Star's attitude at work and problems with Webb. *Id.*

The last person Hansel interviewed on August 25 was Star Pegump. She was first advised of the company's stand on violence and that the subject of the meeting could lead to disciplinary action. Exhibit Q, at 3. Plaintiff did not stop and ask for Kassem's advice during the interview. Campbell's notes reflect when directly asked about the threat Plaintiff at first indicated she did not remember making the statement, but later stated "she might have said something like that jokingly." Exhibit Q, at 3; *see also* Hansel Tr., at 28, 38–40. Plaintiff also stated she was having an early morning conversation about a postal shooting incident and might have generally commented about the security not being very tight at Rockwell. Exhibit Q, at 3. She told Hansel she did not have an ax to grind with anyone and was not aware anyone did with her. *Id.;* Pegump Tr., at 56–57. Plaintiff indicated she did not have a gun and would not carry out such threats. Exhibit Q, at 3; Pegump Tr., at 68. In a deposition taken several months later Plaintiff stated she told Hansel "if I did say those, I said them jokingly." Deposition Testimony of Starlet Pegump, at 57, 60, 181 [hereinafter Pegump Tr.]; *see also* Affidavit of Starlet Pegump, at 1 [hereinafter Pegump Aff.].

During the interview Hansel asked Plaintiff if she was under a doctor's care. Exhibit Q, at 3. She indicated she had recently seen a psychiatrist, Dr. Castillo, because she was tired all the time; he had prescribed medication which she was then taking. *Id.;* Pegump Tr., at 64–67. The medication was a type of antidepressant. Pegump Tr., at 64–67.

At the end of Plaintiff's interview Hansel informed her that she would be on indefinite suspension without pay pending the outcome of an investigation. Exhibit Q, at 4; Pegump Tr., at 67. She was told not to contact Bell or McCarthy, other employees who did not want to talk to her, and she was not to be on company property without prior approval. Exhibit Q, at 4.

Kassem spoke with Hansel after the interview and argued that even if Star had made the alleged statement it was only intended as a joke. Kassem Tr., at 38. He believed Hansel was more troubled by the specificity of the threats than the statement itself. *Id.* Hansel did not speak with any other employees in Plaintiff's area about her work or personality because he did not feel it was necessary. Hansel Tr., at 45. He was operating under the assumption there was a possible risk of violence and the company had to find a way to deal with the situation. *Id.* at 45–47.

Later on the afternoon of August 25 Plaintiff went to see Dr. Castillo. Pegump Tr., at 159–60. She had first seen Castillo on August 17, 1994. Rockwell Exhibit L. Plaintiff discussed her suspension with Castillo and asked him for a letter about her condition. *Id.* Plaintiff and Kassem had apparently spoken after the interview with Hansel about getting an evaluation from her doctor. Kassem Tr., at 45. Dr. Castillo eventually wrote a letter, dated September 8, about Plaintiff's mental condition. Exhibit L. The letter reflects Dr. Castillo had diagnosed "Major Depression" and treated Plaintiff's condition with medication. *Id.* As of September 7 he found her "stable with no depressive symptoms." *Id.* At no time did he believe she was a danger to herself or to others. *Id.* The

letter was apparently provided to Plaintiff but was not delivered to Kassem until September 16. Kassem faxed it to the company the next day. Kassem Tr., at 58–59; Inter. 3.

On August 26, 1994, Kassem filed a grievance on Plaintiff's behalf. Union Record, at Excerpt from Response to Request for Production # 1 [hereinafter RFP # 1]. He stated the Union's position was "that the threat was made in a joking manner with no intent what so ever." *Id.* Plaintiff was informed of the grievance and asked for a copy of it on August 29. Pegump Tr., at 134–36, 183–84. Plaintiff did not receive a copy until October. Pegump Tr., at 161.

Within a few days Kassem contacted Craig Hoepner, the international union representative, about Plaintiff's situation. Kassem Tr., at 52–53; Union's Supplemental Answer to Interrogatory No. 3 [hereinafter Inter. 3].[8] They spoke several times during the next month. Inter. 3. Kassem also contacted at least one business agent for another local union to discuss Rockwell's "past practice with handling incidents involving threats made by employees." Kassem Tr., at 68–69; Inter. 3. He learned Rockwell had taken the same action with respect to other employees involved in workplace incidents or threats of violence.

Hansel turned the company's side of the investigation over to Scott Rundall, Rockwell Human Resource Specialist. *See* Affidavit of Scott Rundall [hereinafter Rundall Aff.]. Kassem spoke with Rundall about the investigation. Inter. 3. Rundall states he reviewed the Plaintiff's statement, employee witness statements, Plaintiff's personnel file, and he spoke with the other staff members involved in the investigation. Rundall Aff., at 1–2. He also communicated with the security department at other facilities and the Iowa Managed Health Care ("IMHC"), the "gate-keeper" for Rockwell's health plan. *Id.* The information he obtained indicated the company generally places

the employee on indefinite suspension without pay until Rockwell can investigate the alleged threats, and until such time as an independent doctor, typically a psychiatrist, can perform a medical evaluation. If the doctor authorizes it, the employee may be placed on short term disability leave. In order to communicate with the various medical providers, Rockwell also requests that the employee sign a release form so that Rockwell and its medical provider can verify the employee's health status independently.

*Id.* at 3.

Plaintiff attended a union meeting at Rockwell on September 7, 1994. Kassem and Hoepner were present at this meeting. Inter. 3; Pegump Tr., at 153. Plaintiff did not voice any concerns over the Union's representation or inquire about the status of her grievance. Pegump Tr., at 153–54.

Also on September 7, Plaintiff's attorney, Wallace Taylor, sent letters to Kassem and Michael Bell requesting that Plaintiff's suspension be resolved promptly by a fair proceeding. Rockwell Exhibit K; RFP # 1 (Union Record).

Deb Hofer spoke with Kassem on September 8 about the threat incident; she later gave him a written statement dated September 14, 1994. Inter. 3; Kassem Tr., at 33–37. During her deposition Hofer stated she had explained to Kassem that on August 12 she and Star were having a general conversation about workplace violence they had seen on the noon news when Star commented on how security at Rockwell had changed. Hofer Tr., at 9–11; *see also* Affidavit of Deb Hofer [hereinafter Hofer Aff.]. Hofer testified "Star made the comment that how easy it would be for someone to come into Rockwell because of the lax security and start shooting anybody. If you go up on the balcony, you can overlook the whole plant up there." Hofer Tr., at 9.[9]

Hofer's September 14 written statement to Kassem was slightly different in that it was

---

**8.** The Court's reference to supplemental answers to interrogatory number three also includes the Union's second supplemental answers to this interrogatory.

**9.** At the deposition Hofer did not recall much of what she had said during the August 25 interview with Hansel.

closer to what MacMillan and Bolton–Severson had reported.[10] Hofer wrote that Star told her, without mentioning names, that it would be easy for someone to come into the workplace by the back or front door and start shooting people. Attachment to Hofer Aff. This, said Hofer, was in the context of a conversation about violence in the workplace. *Id.* Kassem did not relate this information or give the written statement to anyone at Rockwell because he questioned the reason for the change in her statement, and he did not feel it would have made a difference. Kassem Tr., at 35–37; 56–57, 59–62. It appears two other employees gave Kassem written statements which were essentially character references for Plaintiff as well as a petition to the same effect signed by a number of coworkers. *Id.* at 57–62; Pegump Tr., at 138–41; *see, e.g.,* Affidavit of Susan Sorenson. He did not provide these statements to Rockwell. Kassem's deposition testimony is at times unclear, but it appears he viewed this type of information as of little help at the time of receipt by him because he felt the company would not reinstate Plaintiff without more information about her mental health condition. Kassem Tr., at 37.

Rundall telephoned Plaintiff on September 9 to request that she complete an independent medical evaluation and sign a medical release for Rockwell and IMHC. Rundall Aff., at 2; *see also* Rockwell Exhibit N; Pegump Tr., at 191–92. He explained they were interested in verifying that "she posed no risk to herself or others." Rundall Aff., at 2. Rundall indicated the information and release was necessary to get the process moving. *Id.* Kassem also contacted Plaintiff about seeing the company's doctor. Inter. 3; Kassem Tr., at 40–41, 44–46; Pegump Tr., at 193–94. Plaintiff contacted her attorney about the medical release and subsequently refused to submit to a second evaluation or to sign the release because her "medical records had nothing to do with why they suspended me." Pegump Tr., at 192, 194–95.

By the end of September it became clear to Kassem that Rockwell would not take any further steps regarding Plaintiff's employment until she completed a second medical evaluation. Rundall Aff., at 2. Kassem contacted both Plaintiff and her attorney and explained the situation. Inter. 3. He explained the company wanted to confirm Dr. Castillo's opinion, that Rockwell needed a release so the company doctor could speak to Dr. Castillo, and advised them to cooperate. *Id.;* Kassem Tr., at 44–45. Kassem also sent Plaintiff a note dated October 9 indicating he could not move forward on the grievance without her cooperation. Rockwell Exhibit O. Craig Hoepner spoke with Plaintiff's attorney on the same subject. Inter. 3; Pegump Tr., at 144. Kassem does not believe any Rockwell employee or Union member or officer was biased against Plaintiff. Kassem Tr., at 69.

Because Plaintiff did not comply with the company's requests, Rockwell closed its investigation of the threat incident in early October 1994. The Union also ceased its efforts to pursue Plaintiff's grievance. Plaintiff filed her Petition against Defendants in state court on October 17.

### B. Disputed Facts

There are a number of matters on which the facts are arguably disputed. Plaintiff claims Kassem did not properly represent her during the initial interview with Hansel on August 25, investigate the charge against her, or protect her rights under the CBA. Plaintiff first contends Kassem did not get her side of the story before or after she was interviewed and he did not advise her on how to respond to the interrogation. Pegump Aff., at 1–2. Kassem, on the other hand, contends he took Plaintiff out of the room and told her what the allegation was and that she needed to "fight it very hard." Kassem Tr., at 47–48. He indicated she should stop any question she did not understand or ask for a time-out and talk to him if she needed to. *Id.*

Plaintiff contends Kassem did not keep her advised on the status of her grievance and she "had to initiate repeated calls" for information. She further contends Kassem and Hoepner did not talk with her about her case on September 7 after the union meeting.

---

**10.** Hofer wrote a similar letter dated September 14 to Plaintiff's attorney. Rockwell Exhibit H.

Pegump Tr., at 153–54. Kassem disputes this contention throughout his deposition testimony and answers to interrogatories.

As noted above, Hofer's deposition testimony and affidavit as to the statements Plaintiff made on August 12 differ from the version set forth in Campbell's notes from the August 25 interview. Both Plaintiff and Hofer contend Hansel intimidated them during the interview and this pressure caused them to say things they did not really mean. *See, e.g.,* Pegump Aff., at 1; Hofer Aff., at 2. Plaintiff, for example, believes she made it clear to Hansel that she denied making statements as alleged by MacMillan and Bolton–Severson. In addition, Plaintiff disputes other witnesses' comments about her work attitude and alleged problems with JoAnne Webb and Kevin McCarthy.

At the end of the August 25 meeting Hansel states he advised Plaintiff she would need to be evaluated by a company doctor. Hansel Tr., at 73–74. Plaintiff disputes when Rockwell made the request for medical evaluation and information. She further disputes Defendants' claim they asked for a limited release of records so that a company doctor could consult with Dr. Castillo. She believes they sought a release of all of her medical records.

Additionally, Plaintiff has submitted affidavits from several Rockwell employees which relate to the Union's representation of those individuals in connection with prior grievances.[11] As Plaintiff has not presented any evidence showing that either Rockwell or the Union were biased against her personally or otherwise, this information is not relevant to consideration of Defendants' motions here.

### III.

### *Duty of Fair Representation*

### A. **Applicable Standards**

■ Plaintiff's cause of action arises under section 301 of the LMRA, 29 U.S.C. § 185. Pursuant to section 301 federal courts have subject matter jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). This action is commonly referred to as a "hybrid" action.

In a hybrid action, an employee makes claims against both his former employer and his union based on an alleged violation of the collective bargaining agreement by the former employer and an alleged breach of the duty of fair representation by the union.

*Cox v. Boeing Co.,* 833 F.Supp. 836, 840 (D.Kan.1993), *aff'd,* 25 F.3d 1056 (10th Cir. 1994) (Table); *see, e.g., Schmidt v. International Bhd. of Elec. Workers,* 980 F.2d 1167 (8th Cir.1992); *Olsen v. United Parcel Serv.,* 892 F.2d 1290 (7th Cir.1990). To maintain a direct action against Rockwell, Plaintiff must first establish that the Union breached its duty of fair representation in processing her grievance. *Olsen,* 892 F.2d at 1293; *Cox,* 833 F.Supp. at 840.

■ The duty of fair representation arises from the Union's status as the exclusive representative for collective bargaining employees. *Beavers v. United Paperworkers Int'l Union,* 72 F.3d 97, 100 (8th Cir.1995); *Cruz v. Local Union No. 3,* 34 F.3d 1148, 1153 (2d Cir.1994); *Olsen,* 892 F.2d at 1293. This duty is " 'akin to the duty owed by other fiduciaries to their beneficiaries.' " *Beavers,* 72 F.3d at 100 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 75, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51, 62 (1991)); *see also Schmidt,* 980 F.2d at 1169. In *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842, 850 (1967), the Supreme Court defined the duty of fair representation:

[A] Union [has] a statutory duty fairly to represent all ... employees, both in its collective bargaining ... and in its enforcement of the resulting collective bargaining agreement.... Under this doctrine, the exclusive agent's statutory authority to represent all members of a

---

**11.** The Court notes two of the four affidavits are unsigned and thus cannot be considered here. Fed.R.Civ.P. 56(e); *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993). Moreover, unsubstantiated or conclusory allegations fail to create genuine issues of fact. *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 945 (8th Cir.1994); *Pfluger v. Southview Chevrolet Co.,* 967 F.2d 1218, 1220 (8th Cir.1992).

designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*See Carnes v. United Parcel Serv., Inc.,* 51 F.3d 112, 116 (8th Cir.1995). In short, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." [12] *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916, 17 L.Ed.2d at 857; *see, e.g., Beavers,* 72 F.3d at 100.

In determining "fair representation" courts must consider the totality of circumstances viewing the union's performance in a highly deferential light. *O'Neill,* 499 U.S. at 78, 111 S.Ct. at 1135–36, 113 L.Ed.2d at 64–65; *Schmidt,* 980 F.2d at 1169. With respect to an employee grievance,

> [t]he union must provide reasonable assistance to the union member, including, but not limited to, helping the grievant to secure the materials necessary for a fair hearing, putting forward the strongest arguments one could reasonably make on the grievant's behalf, and other forms of assistance or representation necessary for the grievant to adequately prosecute his grievance.

*Olsen,* 892 F.2d at 1295. Union representatives are not held to the same "demanding tests applied to a trained trial lawyer" in connection with the grievance or arbitration process. *Beavers,* 72 F.3d at 100; *see also Curtis v. United Transp. Union,* 700 F.2d 457, 458 (8th Cir.1983). "[T]he final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness' . . . that it is wholly 'irrational' or 'arbitrary.' " *O'Neill,* 499 U.S. at 78, 111 S.Ct. at 1136, 113 L.Ed.2d at 65

(citation omitted).[13] "Mere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation." *N.L.R.B. v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir.1980) (citation omitted); *accord Beavers* 72 F.3d at 100; *Croston v. Burlington Northern R.R. Co.,* 999 F.2d 381, 385 (9th Cir. 1993). Thus, proof alone that the Union refused to take Plaintiff's grievance to arbitration or that her grievance was meritorious is insufficient to establish the Union acted arbitrarily or failed to fairly represent her following the suspension. *See, e.g., Cox,* 833 F.Supp. at 841.

In the same vein, "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion. . . ." *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917, 17 L.Ed.2d at 858. Processing a grievance in a "perfunctory" manner means that "the union acted without concern or solicitude, or gave a claim only cursory attention." *Beavers,* 72 F.3d at 100 (quoting *Curtis,* 700 F.2d at 458); *see also Brown v. Trans World Airlines, Inc.,* 746 F.2d 1354, 1357 (8th Cir.1984).

Employees do not have an absolute right to have their grievance processed or to go to arbitration. *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917, 17 L.Ed.2d at 858. Subject to the requirements noted above, "unions always retain the authority to exercise an independent judgment on the merits of each petition. . . ." *Olsen,* 892 F.2d at 1296. Unions "need only process a grievance as far as its merits warrant." *Id.; see, e.g., Cruz,* 34 F.3d at 1153–54; *Schmidt,* 980 F.2d at 1169–70; *Evangelista v. Inlandboatmen's Union of Pacific,* 777 F.2d 1390, 1395–96 (9th Cir.1985). Likewise, further investigation of a grievance is unnecessary if it would not have produced additional evidence sufficient to affect the employer's decision. *Evangelista,* 777 F.2d at 1395–96.

---

**12.** Violation of the duty of fair representation occurs if the union's discriminatory conduct is "invidious." *Carter v. United Food & Commercial Workers,* 963 F.2d 1078,1082 (8th Cir.1992); *Cox,* 833 F.Supp. at 841. Further, "[b]ad faith requires a showing of fraud or deceitful or dishonest action." *Cox,* 833 F.Supp. at 841 (citations omitted). Here Plaintiff does not base her claim on either the discrimination or bad faith prongs of the test.

**13.** The reasonableness test applies only to the "arbitrary" prong of the three-part test. *Carter v. United Food & Commercial Workers,* 963 F.2d 1078, 1082 (8th Cir.1992).

## B. Analysis

Plaintiff claims the Union either arbitrarily refused to process her grievance or processed it in a perfunctory manner. Amended and Substituted Petition, at 2. More specifically, as the Court understands her argument, Plaintiff claims that (1) the Union should have pursued her grievance by demanding arbitration; and (2) the Union failed to complete an adequate investigation with respect to her grievance. Resistance, at 5, 11.

Plaintiff's entitlement to a hearing is governed by the CBA. The CBA provides once a grievance has been filed (Step 3)[14] either party *can* "appeal to the other party for arbitration of the grievance." Rockwell Exhibit B, at 4. The CBA therefore does not provide for an absolute right to a hearing (or arbitration) of a grievance. The Union may in good faith exercise its discretion in determining whether or not to request arbitration of a grievance under Step 4 of the complaint process.

Plaintiff's claim the Union failed to investigate the facts behind the threat incident is based on her belief that she clearly denied making the statements as alleged by MacMillan and Bolton–Severson. She urges Hansel ignored her denial and intimidated her into saying that if she had made such statements it would have been only jokingly. Plaintiff points to Hofer's deposition testimony and affidavit as support for her argument. Given this information and the unfavorable comments made by witnesses about her attitude and conduct in the workplace, Plaintiff urges the Union had reason to investigate whether Plaintiff's coworkers had a motive to fabricate the reported threat. Kassem did not interview any other employees in Plaintiff's department. No other witnesses to the August 12 incident came forward.

Additionally, Plaintiff points to the fact Kassem refused to present Hofer's written statement or the character references submitted on her behalf to Rockwell. She believes the documents would have supported her argument that she had no motive or means to carry out such a threat, and thus should have been presented to Rockwell at a hearing.

Viewing the undisputed facts in the light most favorable to Plaintiff, the Court does not believe a jury could find the Union acted arbitrarily or perfunctorily in connection with its investigation of the incident. *See, e.g., Cruz,* 34 F.3d at 1153–54 (union failed to investigate the validity of employee complaints); *Tatum v. Frisco Transp. Co.,* 626 F.2d 55, 59 (8th Cir.1980) (union representative failed to call witnesses or present affidavits and ignored obvious sources of proof); *Minnis v. International Union,* 531 F.2d 850, 853–54 (8th Cir.1975) (union failed to take minimal steps to investigate or process grievance). Four people had knowledge of the incident—Pegump, Hofer, MacMillan and Bolton–Severson. The Union representative, Kassem, was present when Pegump and Hofer were interviewed, and he had briefly confirmed with MacMillan and Bolton–Severson what they had told Hansel. The content of those statements, if not the truth, is undisputed.[15] The record does not reflect that Plaintiff shared with Kassem her theory that certain employees had a motive to cause trouble for her. Indeed, she stated during her interview she did not have "an ax" to grind with anyone and did not believe anyone did with her. In light of statements provided by Plaintiff and other witnesses, it was reasonable for Kassem to conclude the strongest argument in support of the grievance was that any statement Plaintiff made was purely in jest and taken out of context.

Kassem did not provide Hofer's written statement to Rockwell, but as it was inconsis-

---

**14.** Because other employees raised the complaint about Plaintiff with Rockwell, Steps 1 and 2 of the CBA complaint process are inapplicable here. Exhibit B, at 4.

**15.** In her resistance to summary judgment Plaintiff asserts Rockwell "knew or should have known, that the allegations did not make sense, that the persons who made the allegations may

have had a motive for falsifying or misconstruing the facts, and that Ms. Pegump denied any knowledge of the alleged statement." Resistance, at 9. A factual dispute as to how the facts were interpreted by Rockwell or the Union does not present a jury question. *Cox,* 833 F.Supp. at 843.

tent with what Hofer had told Hansel and, with its reference to going in the "front" or "back" door, was partially corroborative of what MacMillan and Bolton–Severson had reported, it would not have supported Pegump in her claim she did not make such a statement. The petition and character references would have been supportive on whether Plaintiff should ultimately have been reinstated, but the grievance never progressed to this point because of the deadlock on the medical release issue.

With respect to other investigatory steps, Kassem discussed Plaintiff's situation with the international union representative, Scott Rundall in the Human Resource Department, and security personnel at other facilities. He asked Plaintiff to obtain a statement from her doctor, which he provided to Rockwell. He explained the company's request for a medical release and the need for her to see a company doctor and urged Plaintiff to cooperate. He conferred with Plaintiff's attorney about the matter. Kassem and Hoepner were present at the September union meeting where Plaintiff had an opportunity to voice her concerns over the direction of the Union's actions on her grievance.

■ Turning to the failure to arbitrate claim, Plaintiff appears to argue the Union should have grieved and arbitrated the issue of whether she made the statement attributed to her at all. The Union cannot be faulted on this ground, however, in view of the witness statements of Hofer, MacMillan and Bolton–Severson, and Plaintiff's own suggestion she might have made the statement jokingly. Again, the focus in Kassem's grievance on the context of the statement, rather than whether it was made, was reasonable judgment in light of what the witnesses had said.

■ Nor would the facts support liability based on a failure to pursue the grievance the Union did file. It complained Plaintiff's statement was made jokingly and without bad intent. As the context and seriousness of Plaintiff's statement was the ultimate issue being investigated, it was reasonable for the Union not to pursue arbitration until the investigation had been completed. The CBA, which here too is not a "paradigm of clarity,"

*Carnes,* 51 F.3d at 115, sets time periods for demanding arbitration, but no party suggests these came into play while the investigation was continuing at the insistence of the company. The position taken by the Union was that Plaintiff should cooperate with the company's request that she sign a release so that a company doctor could examine her and confer with her psychiatrist. If this confirmed what Dr. Castillo had opined, that Plaintiff was not a threat to harm others, the result would have supported her in any subsequent arbitration of her status should that have been necessary. Plaintiff claims the Union should have taken a harder line and demanded she be reinstated without the requested medical information. The Union could have done this and its judgment not be questioned, but with the information the Union and Rockwell had concerning the alleged statement and its temporal relationship with Plaintiff's recent evaluation and treatment for depression, it is difficult to characterize its cooperative position as poor judgment, much less so far beyond the pale of reasonableness as to be arbitrary or irrational, or evince only cursory attention. The Court does not believe the evidence would be sufficient to support such findings.

As Plaintiff viewed it she was summarily suspended based on some comment which, if made at all, was innocent and taken out of context. Except for the grievance and Kassem's request for a statement from her doctor, nothing much happened for a couple of weeks. Then Plaintiff was asked to submit a release so that Dr. Castillo could be questioned, her medical records gone into, and a psychiatric exam conducted. The Union urged her to cooperate. Accepting Plaintiff's version of events, it is not difficult to understand her sense that she was treated unfairly by the company and the Union was less than a zealous advocate. But whether there was a breach of the Union's duty of fair representation requires a more objective assessment of whether it provided reasonable assistance under the circumstances and within the latitude allowed by the law. For the reasons indicated, the summary judgment record is short of showing a genuine issue in this

regard and accordingly the Union is entitled to summary judgment.[16]

## IV.

### Breach of CBA

■ As noted, proof of the Union's breach of its duty of fair representation is ordinarily a prerequisite to a section 301 action against an employer. Even assuming Plaintiff has raised genuine issues of material fact with respect to the Union's breach of its duty of fair representation, Rockwell asserts summary judgment is warranted on the claim against it. Plaintiff alleges "Rockwell refused to follow the grievance procedure set forth in the [CBA] and suspended her without good cause." Resistance, at 11; *see* Amended and Substituted Petition, at 2. With respect to the first prong of this, failure to follow the CBA procedure, a Step 3 written grievance was submitted to the company. Unlike Steps 1 and 2, the CBA does not contain express mandatory language requiring a Step 3 answer to the grievance. If the matter is not satisfactorily resolved at Step 3, arbitration may be requested. However, assuming a contractual right to an answer, Plaintiff had been informed at the conclusion of her interview with Hansel that the company would investigate further and it subsequently made its request for medical information. As a practical matter, the company's response was to request information. Arbitration was not requested, hence Rockwell did not breach the CBA by failing to follow through with the CBA's complaint and arbitration procedure to the final step. The contract does not provide, as alleged in the Amended and Substituted Petition, that Plaintiff could not be suspended "without implementation of the complaint and grievance procedure." Amended and Substituted Petition, at 2.

■ Plaintiff's suspension pending investigation of the alleged threat likewise did not constitute a violation of the CBA. In general, violation of an employer's policy or rule may serve as a proper basis for suspension or discharge of an employee. *See Carnes,* 51 F.3d at 113–14 & nn. 1 & 2; *Scott v. Riley Co.,* 645 F.2d 565, 568 (7th Cir.1981); *Renfro v. Interstate Brands Corp.,* 879 F.Supp. 1582, 1584–85 (D.Kan.1995). The employee handbook prohibits disruptive or offensive behavior. Exhibit D, at 2. The individuals who overheard Plaintiff's conversation with Hofer were affected by the statements. Threats of violence, even jokes about violent acts, may reasonably fall within the scope of these rules.

The CBA provides an employee may be terminated for "just cause." Rockwell Exhibit B, at 13. It expressly reserves this as well as the right to manage the company's property and operations, and the discipline of its employees as management rights, subject "to such limitations as are contained in this Agreement." *Id.* at 2. The right to discharge for cause implies the right to conduct reasonable investigation to determine cause. Plaintiff does not identify any contractual limitation on this, or the ability to suspend an employee for a reasonable time during an investigation where there is cause to believe an employee has been involved in an incident affecting workplace safety and security.

These concerns are important, as Plaintiff agrees. Pegump Tr., 168–70. The information Rockwell had about the statement and Plaintiff's recent treatment for depression gave it cause to make inquiry to rule out any danger associated with her mental health. It asked for a release to obtain pertinent medical information.[17] Its actions were consistent with company practice in similar situations. Under the circumstances a reasonable jury could not find Rockwell's request for medical evaluation and information was beyond the

---

**16.** Having concluded Plaintiff has failed to generate a fact question on her claim against the Union, the Court need not address the Union's related claim that Plaintiff failed to exhaust her remedies under the grievance process.

**17.** Rockwell requested Plaintiff be examined by a doctor from IMHC and that her records be re-

leased in order for that doctor to confer with Dr. Castillo. As Plaintiff had first seen Dr. Castillo on August 17 it does not appear Rockwell was interested in Plaintiff's entire medical history. Rockwell indicated it was interested in determining whether at present Plaintiff posed a danger to herself or to others.

scope of a reasonable investigation of the incident and its potential for harm. *Cf. Southeast Human Serv. Ctr. v. Eiseman,* 525 N.W.2d 664, 670–71 (N.D.1994) (employee claiming work-related illness properly terminated for refusing independent medical examination). As a matter of law Rockwell's actions did not violate the terms of the CBA.

V.

Resolving all disputed facts and drawing all inferences in favor of the Plaintiff, the Court concludes no material factual dispute remains requiring resolution at trial on either Plaintiff's claim of breach of the duty of fair representation or breach of the collective bargaining agreement. Accordingly, Defendants' motions for summary judgment are hereby GRANTED. Rockwell's cross-claim against the Union for indemnity and/or contribution was conditioned on a finding of liability to Plaintiff and, no such liability having been established, the cross-claim is moot and shall likewise be DISMISSED. The Clerk shall enter judgment dismissing the complaint and cross-claim, the latter without prejudice.

IT IS SO ORDERED.