**Charles SCOTT, Plaintiff-Appellant,**

v.

**The RILEY COMPANY,**
**Defendant-Appellee.**

No. 80–1439.

United States Court of Appeals,
Seventh Circuit.

Heard Jan. 27, 1981.*

Decided March 9, 1981.

Opinion April 10, 1981.

* This appeal was originally decided by unreported order on March 9, 1981. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Mark B. Bigelow, Chicago, Ill., for plaintiff-appellant.

George L. Plumb, Pedersen & Houpt, Chicago, Ill., for defendant-appellee.

Before SWYGERT, CUMMINGS and WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff-appellant, Charles Scott, filed an action in the district court pursuant to § 301 of the Labor Management Relations Act alleging that his employer, The Riley Company (Riley), breached the terms of the collective bargaining agreement. Scott alleged that the discharge was without just cause. The district court, sitting as trier of fact, concluded that the discharge was proper.

## I.

Scott was employed at The Riley Company from June 26, 1959, until April 24, 1977, the date of his discharge. Riley informed Scott of his discharge by telegram. At trial Riley defended the discharge on the basis that an accumulation of incidents indicated a deterioration in Scott's job performance. The incidents are recounted below in detail because it is the accumulation of these incidents which led to Scott's discharge.

The district court, in finding for Riley, noted that "[m]any incidents were testified to." In his findings the district judge noted two of the incidents, but relied on the other incidents in concluding that "their totality resulted in the poor performance which eventually caused the Plaintiff's discharge." Tr. at 203.

Some of the testimony describing these incidents is in conflict. Of course, it was up to the district court, as trier of fact, to resolve these conflicts. Bearing this in mind, the evidence revealed the following incidents:

1) Riley had a rule against taking food out of the cafeteria. Scott's supervisor, Leroy Swisher, saw Scott drinking coffee in the boiler room and warned him that it was in violation of a company rule.

2) Scott was ordered to move filing cabinets and refused on the basis that it involved the moving of files, which was clerical work and not within his job classification. Swisher testified that the process was to empty the file drawers and move the cabinets and then reassemble the cabinets and files at the new location. Swisher also testified that Scott had performed this task before. Scott eventually performed the task and filed a grievance over the matter.

3) Riley ordered Scott to perform tasks at a different company location in Schiller Park. At first, Scott objected to working in a different location. Also, Scott informed Joe Gump, the company manager, that his car was not functioning and thus he could not drive to Schiller Park. Eventually transportation for Scott was provided and he went to the Schiller Park building. Upon his arrival Scott discovered he had forgotten the keys to the building. This cost several hours in work time. Scott received a written warning about this incident. Also, Scott filed a grievance protesting his temporary transfer to Schiller Park.

4) On August 31, 1975, Scott's formal job description included lawn care and cleaning of areas outside the building. Previous to this formal change Scott testified that he had an agreement with the company to mow the lawn on the weekends. At one point in 1976 Swisher asked Scott to mow the lawn and Scott refused. Scott went to his union steward and thereafter performed the job.

Swisher testified that he asked Scott to clean up a pad outside the building. According to Swisher, Scott had performed the task before but this time Scott claimed that it was not within his job classification.

Another person performed the task and thereafter Scott filed a grievance.[1]

5) Riley employees changed insurance coverage from Traveler's insurance to Banker's Life. Scott, apparently in contravention of the insurance agreement, contacted Banker's Life directly on a claim. Scott received a written warning for this incident stating that such contact was prohibited and could be grounds for dismissal. Scott testified that he contacted Banker's Life because this had been the former practice with Traveler's and he was under the impression that this had not changed.

6) After a day of absence from work Scott was presented with an excused absence form to fill out. The form was presented six days after the absence. Scott refused to fill out the form. Swisher testified that it was company policy to fill out the form and that after Scott refused, Swisher filled out a grievance for the refusal.

7) One final general problem concerned Scott's work in the boiler room. A particular problem occurred during the winter of 1976. A switch in the boiler room was placed in the wrong position which eventually caused pipes to freeze up and crack. Scott testified that his placing of the switch and operations in the boiler room were at the direction of Walter Bauer, supervisor in the boiler room. Some of the testimony by Riley employees inferentially implicated Scott in this incident. Swisher testified that he warned Scott against adjusting the heating controls in the boiler room and that it was a violation of company rules for him to do that. Bauer also testified that Scott misadjusted the boiler room controls as well as the thermostat controls.[2]

There was also testimony that Scott was to keep the boiler room clean and that Scott was warned by Swisher to keep the room clean. In spite of this warning the room was still not kept in satisfactory order.

## II.

Scott contends that the district court erred in concluding that there was just cause for discharge.[3] The resolution of this issue requires two levels of analysis. First, were the district court's findings of fact clearly erroneous? Fed.R.Civ.P. 52. This inquiry focuses on the conflicting testimony over the incidents of Scott's misconduct. Second, after determining the facts, did the district court correctly determine that as a matter of law discharge was proper? Riley urges us to characterize the latter determination as one governed by the clearly erroneous standard of Rule 52. However, we have held that the determination of whether just cause exists is one of law. *S. J. Groves & Sons Co. v. International Brotherhood of Teamsters*, 581 F.2d 1241, 1244 (7th Cir. 1978).

### A.

The district court, in its oral findings, concluded that:

Many incidents were testified to. Specifically, the incident involving the Plaintiff's mismanagement of the boiler room and his refusal to follow established Company procedures which amounted to insubordination in regard to absences, in regard to moving files. These two items, coupled with the other items which were

1. Curiously, the crux of Scott's grievance was that it was unfair to have another person perform a task which properly was Scott's. Eventually Riley agreed to pay Scott for the time he would have worked on the project.

  Apparently some of Scott's other grievances were unresolved at the time of his discharge.

2. There also was testimony which inferentially implicated Scott in an attempt to upset the boiler controls so that emergency work, and thus overtime for Scott, was required. The boiler was monitored while Scott was not working. If a problem developed, Scott was

called and would have to go to Riley and do the appropriate repair. There was testimony that this occurred quite frequently in a short period in 1976. Apparently Riley management believed that Scott intentionally caused the problems to obtain more overtime.

3. Riley argues that Scott's complaint failed to state a cause of action. The district court denied Riley's motion to dismiss. Because we dispose of the case on different grounds, this issue need not be decided.

testified to, in their totality resulted in the poor performance which eventually caused Plaintiff's discharge. (Tr. at 203)

This statement apparently reflected the district court's conclusion that his findings on this matter were in the defendant's favor. We conclude that this was not clearly erroneous.

There is little need for discussion on this point. Our statement of the facts in part I of this order describes the various incidents and the conflicting testimony concerning these incidents. The district court chose to believe the defendant's version of the facts. These determinations should not be disturbed. Also, we note that many of the "facts" that Scott claimed are erroneous are part of the legal determination of just cause.

### B.

We have previously noted the absence of case law which defines "just cause." *Groves*, 581 F.2d at 1244 n.6. As we observed in *Groves*, this is a result of most cases arising in the context of arbitration—which, under the collective bargaining agreement between Riley and its employees, was available only at the agreement of both parties and in this instance Riley refused. We further noted that the determination of just cause was to be done on a case by case basis. 581 F.2d at 1244.[4] In *Groves*, however, we did state in general terms the various employer interests at

stake. Specifically, we noted the concern over job safety, employee discipline, and employee morale. *Id.* at 1245.

With these employer concerns in mind, we analyze the various incidents at issue in this case. Scott's repeated refusals to follow company rules—no food out of the cafeteria, filling out of excused absence forms, no direct contact with the insurance company, and not adjusting boiler controls—implicate both employee discipline and morale. It is self-evident that an employer has a right to see that reasonable plant rules are followed. Absence of employee discipline can lead to economic loss for the employer. Also, failure to follow company rules can affect plant morale—if rules are flouted or enforced unevenly tension may arise among employees.

Scott's repeated refusal to perform jobs when ordered also created discipline problems. In response Scott contends he sought only to protect his rights and should not be punished for filing grievances defining the limits of his employment. We agree that an employee should not be punished for filing grievances or protecting his rights. However, the controlling collective bargaining agreement required an employee to perform a job when requested to and then file a grievance. Scott disregarded this procedure and instead refused to perform the jobs at all or only after a delay.[5]

---

4. Scott cites many arbitration cases in his brief. In *Groves* we noted that these decisions were not binding on courts. 581 F.2d at 1245. Therefore, we reject Scott's attempt to have us adopt the criteria set forth in arbitration decisions. Also, adoption of such principles would upset the need for the careful case by case analysis we set forth in *Groves*.

General definitions of just cause have often been set forth. In *Local 205 United Elec., Radio Mach. Workers Am. v. General Elec. Co.*, 172 F.Supp. 53 (D.Mass.1959), then district court Judge Aldrich wrote:

Good cause . . . means what a reasonable person would find sufficient; the phrase creates an objective rather than a personal subjective test.

*Id.* at 56.

5. Scott also argues that many times the incidents involved honest mistakes or were halted

after a warning was given. There was no evidence that Scott failed to follow Riley's rules after being warned about directly contacting the insurance company or taking food out of the cafeteria. Also, Scott was not presented with the excused absence form until six days after his absence. There was no testimony on the cause for this delay. While an innocent breach of a company rule may not cause serious problems, repeated incidents may. Eventually, the employee should learn the rules of his job. Also, repeated claims of innocent mistakes casts doubt on that employee's credibility.

Scott also urges that we adopt some kind of "industrial due process" and that it was violated in this case. We disagree. First, we do not believe it provident to adopt a strict procedure in such cases. Second, our review of the record indicates that Riley and its management

Scott's breach of company rules created safety hazards.[6] He did not keep the boiler room in the proper condition. His violation of the company rule prohibiting food outside of the cafeteria created potential safety problems. Finally, we note Scott's problems maintaining the boiler. While the testimony did not clearly indicate that Scott was responsible for the action which caused the pipes to freeze, there was testimony as to Scott's refusal to keep the appropriate thermostat and boiler settings. His refusal to follow company policy on this matter created a safety hazard as well as costing his employer in the form of high heating bills.[7]

■ The district court's findings on the factual incidents were not clearly erroneous. We believe that the accumulation of these incidents justified Scott's discharge. This is not a case of a single or insignificant act of misconduct or insubordination but rather a continued pattern of misconduct and breach of company rules. *Resilient Floor & Decorative Covering Workers, Local Union 1179 v. Welco Manufacturing,* 542 F.2d 1029, 1032–33 n.4 (8th Cir. 1976). The punishment was related to the seriousness of the offenses. *Groves,* 581 F.2d at 1245.

Therefore, the judgment of the district court is affirmed.

---

did not act without adequate investigation or a basis in fact. Also, many of the factual disagreements concern the application of law to the facts rather than a dispute over the primary facts.

6. There was testimony by Bauer that Scott threatened him. Riley does not emphasize this point but it certainly concerns employee discipline and plant safety.

7. Scott claims that he never was warned of the possibility of discharge and that the normal procedure for discharge was not followed.

There are three responses to this contention. First, the district court properly concluded that Scott received several warnings after the incidents. Second, Riley notified Scott by telegram because a union election in which Scott was a candidate was occurring at that time. Also, considering the history of Scott's poor performance the normal procedure for suspension and warning may have long passed.

At oral argument counsel for Scott conceded that the discharge was unrelated to Scott's candidacy in the union election.