**Donald L. CRIDER, Plaintiff–Appellant,**

v.

**SPECTRULITE CONSORTIUM, INCORPORATED, a corporation, and United Steelworkers of America, Local Union Number 4804, Defendants–Appellees.**

**No. 97–1941.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1997.

Decided Nov. 25, 1997.

Joseph R. Brown (argued), Edwardsville, IL, for Plaintiff–Appellant.

Andrew J. Martone, Bobroff, Hesse et al., St. Louis, MO, for Spectrulite Consortium, Inc.

David L. Gore, Chicago, IL, Andrew J. Krafts (argued), United Steelworkers of America, Assistant General Counsel, Pittsburgh, PA, for United Steelworkers of America, Local Union Number 4804.

Before POSNER, Chief Judge, and MANION and EVANS, Circuit Judges.

MANION, Circuit Judge.

After returning from sick leave Donald Crider refused to submit to a routine drug test. The refusal escalated into a confrontation with his supervisors which cost him his job. His union filed a grievance for him, but when the employer held firm, the union chose not to take the grievance to arbitration. So Crider sued his former employer claiming that it breached the collective bargaining agreement, and sued his union claiming that it breached its duty of fair representation. The district court granted the defendants summary judgment. We affirm.

## I.

From March 1986 to November 1994, Crider worked in various positions for Spectrulite Consortium, Inc. ("Spectrulite"), at its Madison, Illinois, magnesium and aluminum extrusion plant. Crider's exclusive bargaining agent was the United Steel Workers and its Local 4804. Except where the distinction between the International and the Local is significant, we will refer to the two interchangeably as the "Union." A collective bargaining agreement (CBA), which the Union and Spectrulite had negotiated, governed Crider's employment.

In August 1994, Crider took a six-week leave of absence after having a hernia operation. On November 1, which was about two weeks after Crider had been back to work on full duty, Spectrulite told Crider that he would have to undergo a return-to-work physical, including a drug test. Spectrulite was relying on a "Comprehensive Alcohol/Drug Program," which the Union and Spectrulite had negotiated and which was made an attachment to the CBA. Section II.4 of the Program provided that Spectrulite could order an employee to undergo a drug test "for just cause." Section II.7 provides:

Non–Users: The policy protects their freedom. We apologize for testing non-users, yet it is in order to protect their safety and health. If anyone is falsely tested, the Company will pay the employee $250.00 and issue a written apology.

a) Employees who are absent from the plant for thirty (30) days or more ... may be tested as part of the return to work physical. The $250.00 for a negative test result will not be required in their situation.

The Program also provides that "[a]ny employee refusing to allow the urine sample and/or blood test will be terminated."

Spectrulite first scheduled the physical and drug test for a time when Crider was not scheduled to work. Because the physical was supposed to be conducted during working hours, Crider—through his Union representatives—complained, and Spectrulite twice rescheduled the physical to accommodate Crider's work schedule. It was finally scheduled for November 9. On that day, Crider complained that he did not have transportation to the physical. Susan Damsgaard–Brand, Spectrulite's Human Resources Manager, agreed to provide transportation for Crider. Crider then asked Donald Devany, president of the Local, if Spectrulite would pay him $250 if he passed the drug test. Devany told him that it would not because the test was part of a return-to-work physical. Crider said that he would not take the drug test, then. Crider claimed that because he had already been back to work for 30 days, he was not obligated to take the physical. Devany answered that if he refused to take the drug test, Spectrulite would probably fire him. Crider responded, "Well, then, if that's the way it's going to be, that's the way it will be. If they can't go by the contract, then there it is."

Later that day, Devany and Ed Gray, another union official, urged Crider to take the drug test. They told him that if he took the test and passed, the Union would file a grievance if Spectrulite did not pay him $250. Crider rejected this advice. His foreman then told him to leave the plant if he wasn't going to take the physical. On his way out, Crider was met by Damsgaard–Brand and Randy Riebeling, a manager. Damsgaard–

Brand told Crider that he would be fired if he refused to take the drug test. Crider asked if he would be paid the $250 if he passed, and Damsgaard–Brand told him "no." Crider responded, "That's all I need to know," and left. Spectrulite suspended Crider that day.

The Union requested a hearing concerning Crider's suspension. Prior to the hearing, Devany asked if Crider was open to settling the drug test issue. Crider stuck to his position: he would only take the drug test if Spectrulite first agreed to pay him $250 if he passed. At the hearing, Devany tried to put the best "spin" that he could on the events leading up to Crider's exchange with Damsgaard-Brand. He suggested that there had been a misunderstanding. He said that Crider was willing to take the drug test but believed that he would be entitled to the $250 if he passed. Plant Superintendent Julius Smith told Devany that Crider had been suspended both for refusing to take the test and for his insubordination toward Damsgaard-Brand, which Spectrulite saw as two separate offenses. According to Smith, Crider should have taken the drug test and then filed a grievance if he disagreed with Spectrulite's application of the Program. And in no event should he have challenged Damsgaard–Brand's authority the way he did. The parties reached no resolution at this hearing, so three days later Spectrulite fired Crider.

The CBA creates a grievance procedure to settle disputes regarding the interpretation of the CBA, including whether Spectrulite had "just cause" to fire an employee. The procedure progresses through five steps. Steps 1 through 3 involve meetings between representatives of the Local and Spectrulite. If the grievance is taken to Step 4, a meeting is held between representatives of Spectrulite and the International Union. At this point the International is solely responsible for handling the grievance, as it is at Step 5, which is binding arbitration. Like all progressive grievance procedures, the goal is to avoid arbitration, which is costly, by resolving the grievance if possible before it gets that far.

Because it involved a termination, when the Union filed a grievance after Crider was fired, the CBA required that the griev-ance skip Steps 1 and 2 and go immediately to Step 3, where Spectrulite promptly denied the grievance. The Local appealed, and David Kins, the International representative, pursued the grievance at Step 4. Spectrulite again denied it, and Kins decided not to appeal to arbitration. This was solely his decision. In a letter, Kins explained to Crider that the Union had accepted his termination as proper because of his insubordination. Kins relied on the rule generally applied in industrial relations that an employee must "obey now and grieve later."

Crider filed this suit on May 15, 1995. After full discovery, the defendants moved for summary judgment, which the district court granted. We review *de novo* the district court's decision, applying the same standards that the district court applied.

## II.

### A.

■ Crider filed his claim against the Union and Spectrulite under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. That section gives federal courts jurisdiction over suits to enforce the terms of collective bargaining agreements. Crider's claim is a so-called "hybrid 301" action because he has sued the Union for breaching its duty of fair representation and his employer for breaching the collective bargaining agreement. *Ooley v. Schwitzer Div., Household Mfg., Inc.*, 961 F.2d 1293, 1297–98 (7th Cir.1992). In a "hybrid 301" suit, the employee's claim against the union and his claim against the employer are interlocked: neither claim is viable if the other fails. *See, e.g., White v. General Motors*, 1 F.3d 593, 595 (7th Cir. 1993).

■ Courts are generally reluctant to construe as a matter of law the terms of a collective bargaining agreement where, as here, the parties to the agreement have opted for a grievance mechanism to resolve such disputes. *Ooley*, 961 F.2d at 1298. But in cases such as this where the employee complains that the Union breached its duty of fair representation by refusing to take the grievance to arbitration, the court must look

at least to the arguable merits of the grievance, which necessarily involves looking at the contract. *Id.* Where the court is well able to decide that the employee's contractual claim lacks merit as a matter of law, it is appropriate for the court to decide the case on that issue. *Id.*

### B.

■ We first turn to the question whether Spectrulite breached the CBA when it fired Crider. The substantive law in a section 301 suit for breach of the collective bargaining agreement is federal common law rather than state law. *Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957); *United Steelworkers of America v. Rawson,* 495 U.S. 362, 368, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990); *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1180 (7th Cir.1993).

■ The CBA requires that Spectrulite have "just cause" to fire Crider. Whether the undisputed facts of a particular case establish just cause is a question of law for the court. *S.J. Groves & Sons Co. v. Int'l Brotherhood of Teamsters,* 581 F.2d 1241, 1244 (7th Cir.1978); *Scott v. Riley Co.,* 645 F.2d 565, 567 (7th Cir.1981). "Just cause is a flexible concept, embodying notions of equity and fairness." *Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of America,* 85 F.3d 1289, 1294 (7th Cir.1996). And "for a penalty to be just it must be in keeping with the seriousness of the offense." *Groves,* 581 F.2d at 1244–45. Although it does not define "just cause," the CBA in this case provides some guidance. Article 5.3 lists "failure to comply with instructions of supervision" as a "severe" disciplinary infraction. And an employee who refuses to take the drug test "will be terminated."

Crider argues that not every act of insubordination will justify terminating an employee. We may agree, but that is no help to Crider. No one expects an employee to comply with an order to remove the safety device on a dangerous piece of equipment on which he is working. And it would be a different case if Damsgaard–Brand had ordered Crider to go to her home and mow her lawn. But that is not what happened here. Crider

was given a reasonable instruction and he refused to comply with it. Rather than follow the time-honored principle of industrial relations that—with few exceptions—an employee must "obey now and grieve later," Crider chose to exercise "self-help" and simply refused to obey Damsgaard–Brand's order. That was his prerogative, but not his right under the CBA.

An employee's refusal to comply with orders and reasonable work rules poses real harm to the employer. *Scott,* 645 F.2d at 568. One harm is economic. Id. Here, work time was lost by several employees in dealing with Crider's refusal to take the drug test. And economic harm is likely to result whenever employees refuse to perform the tasks assigned to them. We also recognize the potential harm to employee morale and discipline. *Scott,* 645 F.2d at 568. It is clear that both would suffer if Crider were permitted to disobey orders when he disagreed with them. Other employees would undoubtedly wonder why they should obey rules when Crider could flout them. And his insubordination, if unpunished, would undermine the supervisors' authority with all the employees.

The record shows that Crider had a long history of conflict with his supervisors, particularly Damsgaard–Brand. And he candidly explained why: he enjoyed that conflict. Crider recounted specific instances in which he had confronted Damsgaard-Brand and challenged her authority. He stated that "I argued with her tooth and nail, had a lot of fun with her." He explained that "I just wouldn't say yes, ma'am and no, ma'am and knuckle under and do what she wanted to do, so we had a very serious personality conflict, you might say, which was all right with me because I always enjoy that." He explained: "I always had fun with [Damsgaard–Brand] when we talked. I mean she liked to get excited, and I was the only one that could get her riled where she'd actually use some of them words that women weren't supposed to use."

Crider also had conflicts with two of Damsgaard-Brand's superiors: Vic Stirnaman and Julius Smith, with whom Crider said he also "had fun." Crider's sport at the expense of others was not limited to his supervisors; he

also had "fun" with Joyce Wickham, the company nurse:

Q: Oh, yeah, she's a ball. She's more fun than a little bit.

A: Oh, yeah, she's a ball. She's more fun than a little bit.

Q: And why is that?

A: Because she asked for it, just like Mrs. Damsgaard....

[Crider Dep. p. 138]

Moreover, Crider's refusal to follow the "obey now and grieve later" principle was not an oversight. Crider had filed more than one grievance to vindicate his interpretation of the CBA, but Crider believed that while other employees may have to obey orders, he could disobey any order that he thought was wrong:

Q: Just so I understand an answer you gave to [Spectrulite's counsel] on another question, if I understood you correctly, if the company gave you an order which violated the contract, an employee is not required to necessarily comply; is that correct?

A: I didn't say any employee. I said I.

Q: You, Don Crider, is not required?

A: I myself, if I get an order to do something and it is in direct violation of the contract, or in direct to my nature [sic], it ain't right, I don't do it, no matter what it is, whether it's the company, you, him, or anybody else.

[Crider Dep. p. 105]

Crider acted as a law unto himself, deciding which orders to obey and which to refuse. And he aggressively challenged his supervisor's authority because he found some sort of pleasure in that conflict. Spectrulite—like any company—cannot be expected to function efficiently with an employee who acts like Crider, and federal labor law does not require it to try. As a matter of law, Spectrulite had just cause to fire Crider for his insubordination.

## C.

■ Our conclusion that Spectrulite did not breach the CBA when it fired Crider resolves the case for the Union as well. Although not essential to the resolution of this appeal, we agree with the district court's conclusion that Crider's claim that the Union breached its duty of fair representation cannot survive summary judgment. The only

act that Crider alleges breached the duty of fair representation is the Union's decision not to arbitrate his grievance. A union breaches its duty to fairly represent its members where its conduct toward one of its members is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). "Arbitrary," "discriminatory," and "bad faith" are three separate parts of the fair representation test, and each must be analyzed individually. *Ooley,* 961 F.2d at 1302.

■ To be "arbitrary," a union's conduct toward its member must be "so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 78, 111 S.Ct. 1127, 1136, 113 L.Ed.2d 51 (1991) (citation and internal quote marks omitted). We concluded above that Spectrulite had just cause to fire Crider for insubordination. Crider also violated the "obey now and grieve later" rule generally applied in arbitration proceedings. So Kins had ample reason to believe that he could not win Crider's grievance at arbitration. His decision to drop it, therefore, is not irrational but rather was reasonable.

■ Although whether the Union's conduct was discriminatory and whether it was in bad faith must be analyzed separately, the analyses are related. Whereas the arbitrariness analysis looks to the objective adequacy of the Union's conduct, the discrimination and bad faith analyses look to the subjective motivation of the Union officials. *Trnka v. Local Union No. 688, UAW,* 30 F.3d 60, 63 (7th Cir.1994). To support his discrimination and bad faith claims, Crider asserts that he was in "disfavor" with the Union because he had thrice run for president of the Local and the last time he narrowly lost. But Crider cannot point to any conduct by the Local officials that would suggest they treated him with disfavor. On the contrary, the record shows that the Local officials did try to help Crider. Devany and Gray urged Crider to take the drug test and then grieve so that he would not lose his job. This was good advice that Crider foolishly ignored. Devany tried to broker a settlement with Spectrulite and when that failed he filed and pursued a griev-

ance to get Crider reinstated. This record does not create a reasonable inference that the Local officials disfavored Crider.

More importantly, whether the Local officials "disfavored" Crider is not particularly relevant because Kins, who was not connected to the Local, was the person who decided to drop Crider's grievance. In an effort to pin a bad motive on Kins, Crider submitted a self-serving and conclusory affidavit in which he asserted that Kins did not like him and had never done anything for him. But Kins twice successfully pursued grievances for Crider, including getting Crider's job back after he had been fired in 1991. Crider complains that in a second, unrelated grievance, Kins did not get enough money for him, but the record is devoid of anything—other than Crider's bare assertion-that would suggest that the grievance was worth considerably more than the $4,600 that Kins got for him. This record does not create a reasonable inference that Kins had an improper motive toward Crider. See *Souter v. Int'l Union, UAW*, 993 F.2d 595, 599 (7th Cir. 1993) ("the union's willingness to pursue [plaintiff's] meritorious claim tends to show that it bore no ill will toward him [when it dropped his meritless claim]").

Crider argues that the Union discriminated against him because it had arbitrated the grievances of two other employees who had been fired for refusing to take the drug test. The two employees were found drunk at work and were ordered to take a drug test. Both refused and both were fired. As in Crider's case, the Union grieved their terminations through Step 4, and Spectrulite denied them. It appears from the record that the Union may have intended to arbitrate both grievances or at least threatened to do so. But it did not actually arbitrate either grievance. One grievance was settled by the employee accepting some severance pay and agreeing to resign. The other grievance was settled with the employee being placed in a substance abuse program.

One might expect that a union that at least threatened to arbitrate the grievances of two employees who were found drunk and refused to take a drug test would at least threaten to arbitrate the grievance of an employee who refused to take the drug test but was not drunk. (Everyone agrees that there was no indication that Crider had any substance abuse problems.) The threat of such arbitration might have at least gotten some small settlement for Crider as it did for the one employee. At oral argument, counsel for the Union explained the difference between the situations as this: the other two employees had problems with alcohol, but Crider had a problem with authority. An arbitrator might determine that an alcoholic should be provided substance abuse treatment, but there is no similar help for Crider's problem. This is a reasonable distinction. Unions must be given discretion in picking their fights because even when they are pursuing an individual grievance, they are still representing all their members, and they may rightly consider the impact on their future credibility that pursuing a particular grievance may have. *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995). Given that unions have broad discretion about whether and when to settle a grievance, and given that Crider's evidence that Kins had an improper motive is weak at best, we agree with the district court's conclusion that Crider failed to raise a reasonable inference of discrimination.

Crider argues that the Union's bad faith is shown by its "Orwellian double-speak." The Local officials Devany and Gray urged Crider to take the drug test and then grieve later if he did not receive $250. But the International representative Kins testified in his deposition that had Crider filed such a grievance, Kins would not have taken it to arbitration. Crider asserts that these "contradictory" positions show the Union's bad faith. We disagree. Devany and Gray gave Crider good advice, but he was too stubborn to take it. Had he followed their advice he would have kept his job and may have gotten his $250 in the grievance steps short of arbitration. Kins testified that he would not have taken such a grievance to arbitration because it would have been meritless. Under his interpretation of the CBA and the Alcohol/Drug Program—both of which he had negotiated—Crider was not entitled to the $250 payment. This was a reasonable explanation, and on these facts there is no reasonable inference of Kins's bad faith.

In short, we agree with the district court's conclusion that Crider's claim against the Union was without merit.

### III.

Spectrulite had just cause to fire Crider because of his insubordination, so Spectrulite did not violate the CBA. Thus Crider's claim against Spectrulite fails, which also dooms his claim against the Union. The judgment of the district court is therefore AFFIRMED.