Robert M. **POWER**, Plaintiff,

v.

**KAISER FOUNDATION HEALTH PLAN OF THE MID–ATLANTIC STATES INC., and**

**Local 400, United Food and Commercial Workers International Union, AFL—CIO, CLC, Defendants.**

No. Civ.A. 99–959–A.

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 23, 2000.

Robert Dolor L'Heureux, Law Offices of Robert D. L'Heureux, Alexandria, VA, for plaintiff.

Nelson David Cary, Seyfarth, Shaw, Fairweather & Geraldson, Washington, DC, Ronald Cohen, Ronald M. Cohen & Associates, Arlington, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this "hybrid" case brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185,[1] plaintiff claims

---

1. When an employee is represented by a un-    ion pursuant to a collective bargaining agree-

that his employer lacked just cause to terminate him, and that his union breached its duty of fair representation by deciding not to pursue plaintiff's claim through arbitration. In the motion at bar, the union and the employer move for summary judgment, arguing that the union's decision was within its discretion, and that the employer had just cause to terminate plaintiff.

## I[2]

On November 5, 1998, defendant Kaiser Foundation ("Kaiser"), a medical services provider, terminated plaintiff Robert Power's employment in Kaiser's Behavioral Health Center located in Merrifield, Virginia ("the Merrifield facility"). The termination occurred after a series of telephone calls between plaintiff and a patient and his wife, Mr. and Mrs. Doe.[3] In this lawsuit, plaintiff contends that Kaiser terminated him without just cause in violation of the Collective Bargaining Agreement ("CBA") that governed plaintiff's employment with Kaiser, and that plaintiff's union, defendant Local 400 ("the union"), plaintiff's exclusive representative under the CBA grievance procedure, breached its

duty of fair representation by declining to take plaintiff's claim to arbitration on the ground that it lacked merit. The facts leading to plaintiff's discharge are recounted below.

In August 1996, plaintiff was hired as an "access triage therapist" in the "Access" division of the Merrifield facility. This division was the point of contact for patients seeking to make appointments or ask questions about their medication or treatment. As an access triage therapist, plaintiff's primary responsibility was to receive incoming calls, make an initial assessment of each patient's mental health and medical needs, and schedule appointments in accordance with Kaiser's scheduling policies.[4] Given these duties, plaintiff's position required professional training and clinical experience in addition to basic administrative skills. There is no dispute that plaintiff's educational background and work history included the professional and clinical experience required for his employment as an access triage therapist.[5] Yet, from the outset of plaintiff's employment at Kaiser, patients and colleagues alike lodged complaints about his behavior and performance. Recounted here are various

ment, the employee may not sue the employer on that agreement unless he can also prove that the union breached its duty of fair representation of the employee. *See Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). For this reason, suits brought by employees against an employer for breach of a collective bargaining agreement are referred to as "hybrid" § 301 claims. *See, e.g., DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) ("The suit is ... not a straightforward breach of contract suit under § 301, ... but a hybrid § 301/fair representation claim....").

2. Consistent with the constraints of Rule 56, Fed.R.Civ.P., the facts recited here are based on plaintiff's deposition testimony, other uncontested testimony, affidavits, documentary evidence in the record, and defendants' statement of material undisputed facts, to the extent that plaintiff has not disputed them.

3. The parties have referred to the patient and his wife as Mr. and Mrs. Doe to protect their privacy.

4. At first, Kaiser staffed Access exclusively with clinical professionals. Then, in June 1998, Kaiser reorganized Access to consist of two professional clinical positions and three clerical positions. The clerical staff handled only the routine phone calls. Where a call required the exercise of clinical judgment, the clerical staff forwarded the call to one of the clinicians.

5. Plaintiff has undergraduate degrees in philosophy, psychology, and sacred theology, a master of arts in psychology, and, at the time of his deposition, he was pursuing a doctorate in counseling psychology. In addition, plaintiff is a certified addiction counselor, and had seven years of relevant clinical and professional experience prior to working for Kaiser. Plaintiff also had extensive non-clinical experience. From 1968 until plaintiff began his career in counseling, he was employed, *inter alia*, as a priest, a legislative assistant for a congressman, a public affairs assistant for the Department of Housing and Urban Development, and a self-employed public affairs consultant.

of those events, the essential facts of which are uncontested, although plaintiff disputes their significance.

- Soon after plaintiff was hired, his supervisor, Sandra Mansfield, received complaints about his conduct and job performance. Among the complaints was a charge that plaintiff made sexually explicit comments to patients. Based on these complaints, and on her own observations, Mansfield extended the plaintiff's "probationary" period by 90 days. In addition, by memorandum dated October 22, 1996, she warned plaintiff (i) to increase his knowledge of appointment types and clinical issues, (ii) to improve his technical and computer skills, and (iii) to discontinue sexual references and jokes in conversations with colleagues and patients.

- In September 1997, two female colleagues complained to management that plaintiff had sent them a postcard featuring the close-up photograph of a woman's posterior, clad in nothing but a thong bikini. Plaintiff had written on the back of the postcard, "When I saw this CA sunset, I thought of the two of you. . . ."

- On October 10, 1997, one of plaintiff's colleagues lodged a complaint, describing (in the colleague's opinion) plaintiff's failure to assess a patient's state of mind correctly.

- In January 1998, plaintiff received a mediocre performance evaluation of "needs improvement"[6] in the categories of job knowledge, quality of work, adherence to Kaiser policies, professionalism, and effectiveness in dealing with co-workers and his supervisor.[7] Based on plaintiff's performance evaluation, Mansfield initiated a series of meetings, termed "supervisories," to discuss performance issues as they arose.

- On April 2, 1998, Mansfield issued a written warning to plaintiff based on plaintiff's handling of a call made by a patient from the emergency room at Fairfax Hospital. Specifically, Mansfield noted that plaintiff (i) had failed to rule out suicidal ideation, (ii) "did not determine why [the patient] was in the ER," (iii) quoted the Bible to the caller, and (iv) told her that "men get scared when women are angry." Plaintiff does not remember quoting the Bible, but admits he may have made the comment about "men get[ting] scared." Plaintiff did not challenge the April 2 warning.[8]

- On May 15, 1998, Mansfield issued a Final Written Warning ("Final Warning"), which described the following four incidents:

(i) On April 17, 1998, plaintiff allegedly mishandled a call in which the mother of a fourteen year old girl sought treatment for her daughter when she learned that her daughter had been sexually abused, and then failed to follow the instructions Mansfield gave him after the incident to correct his error. Plaintiff apparently informed the mother that he could not schedule an appointment for her daughter until the

---

6. The only level below "needs improvement" was "unsatisfactory."

7. On January 30, 1998, another colleague lodged a complaint in which she alleged that plaintiff had made religiously motivated comments. Specifically, the colleague, who is Jewish, claimed that plaintiff said of her, "wherever there is a shekel there you are." This colleague also alleged that plaintiff made comments suggesting that she was a sycophant and held a roll of toilet paper over her head to proclaim her the "Chief of Grand Central." Plaintiff denies the colleague's accusations, although he admits using the word "shekel." Resolution of this dispute is not material to disposition of the motions at bar.

8. The union did not file a grievance with respect to either the April 2 or the Final Written Warning issued on May 15, 1998 (although plaintiff inquired about filing a grievance for the latter). In the absence of a formal grievance, arbitrators typically accept the facts of a written warning as true. *See In re Trendler Metal Prods.*, 101 Lab.Arb.Rep. 749, 754–55 n. 2 (1994) (Green, Arb.) (finding that "notices issued to the grievant . . . are properly part of the grievant's work record"). Even were this not the case, the factual record on these matters is essentially uncontroverted, as plaintiff has not challenged here the essential facts underlying the April 2 and the May 15 warnings.

mother reported the abuse to Child Protective Services. It was, according to the Warning, plaintiff's responsibility to report the abuse, and to schedule a prompt appointment for the child. Plaintiff was specifically instructed to (i) call the mother and apologize, (ii) schedule therapy for her daughter, (iii) determine the availability of a core or network provider for assessment and treatment, and (iv) report the abuse. When Mansfield met with plaintiff to follow up on his performance, plaintiff had not complied with Mansfield's instructions; he had not contacted child protective services, and he had not contacted a core or network provider for purposes of assessment and treatment.

(ii) On April 21, 1998, plaintiff received a call from a suicidal patient and, having decided to schedule an appointment for her that day with the duty doctor, he placed the telephone down so that he could contact the doctor. After he broke communication with her by placing the phone down, the patient hung up and would not respond to calls made to her house. Plaintiff admits that a clinician should never break contact with a suicidal caller, but he does not concede that his action in putting the telephone down reflects an error in judgment and violation of policy.

(iii) Earlier in the spring, plaintiff misunderstood a patient's request for therapy as a request for a medication evaluation. Thus, at the conclusion of their telephone conversation, the patient believed plaintiff would return his call to schedule an appointment. After three weeks, the patient called again and spoke with another therapist, at which time the patient learned that plaintiff had not, in fact, referred him for therapy as he had requested, but instead had referred him for a medication evaluation, which service he had never requested.

(iv) On May 11, 1998, plaintiff erroneously informed a patient, referred to Merrifield for urgent care by another division of Kaiser, that urgent care was available only for suicidal callers and subsequently referred the patient to primary care. The Final Warning stated that the caller met the requirements for urgent care and that it was inappropriate for plaintiff to refer the patient to primary care.

The Final Warning concluded that "further issues of this nature" would lead to termination, a warning Mansfield reiterated verbally. Plaintiff consulted with a union representative concerning a grievance, but never filed a grievance relating to this Final Warning.

Plaintiff was finally terminated as a result of a series of telephone conversations on October 29, 1998, between plaintiff and Kaiser members, Mr. and Mrs. Doe. On that day, Mrs. Doe contacted Access to schedule an appointment for her husband. Kaiser policy required patients to schedule their own appointments so that a clinician might make an accurate appraisal of that patient's therapeutic needs. The parties agree that an exception to this policy arises if the patient is suicidal, out of control, or otherwise unable to schedule his own appointment. In those circumstances, another person, *i.e.*, a spouse or other family member, may schedule an appointment in the patient's name. Thus, when Mrs. Doe called Access, the member of the clerical staff who first spoke with her declined to schedule an appointment based on the policy, but transferred the call to plaintiff. Mrs. Doe told plaintiff that Mr. Doe reported he was "feeling crazy," that Mr. Doe was "getting into one of these crazy streaks," and that she needed to schedule a prompt appointment for him. Plaintiff informed Mrs. Doe that, "unless it's a dire emergency," he would need to speak with Mr. Doe directly. Although plaintiff knew from the records that Mr. Doe had been diagnosed as "mixed bi-polar condition," or "manic depressive," he judged that this occasion was not a sufficient reason to deviate from the policy. Instead, plaintiff offered to give Mrs. Doe his direct phone number so Mr. Doe could contact plaintiff directly to schedule the appointment. Immediately thereafter, Mr. Doe called plaintiff, expressed his anger about the fact that his wife could not

schedule an appointment for him, and scheduled an appointment for later that day. Five minutes later, Mrs. Doe called plaintiff back, and, in the course of the ensuing conversation, plaintiff admits he told Mrs. Doe (i) that her husband "shouldn't hide behind ... a spouse to make [his] appointments" if he is to "take ownership for [his] own health," [9] (ii) that some people "think they are getting an HMO policy that's a Cadillac, but sometimes it is like a Ford," and (iii) that "sometimes people ... find that Blue Cross/Blue Shield has ... a wider coverage and ... more alternative means of filling clients' demands." [10]

According to Kaiser, plaintiff's conversation with the Does so enraged Mr. Doe that when he appeared for his appointment, (i) he threatened the mental health assistant that was at the desk, (ii) made threatening comments about plaintiff, and (iii) was described as "out of control" by Mansfield.[11] The next day, Mansfield, another manager, and the doctor who treated Mr. Doe met with plaintiff to discuss plaintiff's encounter with the Does. After the meeting, Mansfield received news that Mrs. Doe had filed a complaint with Kaiser's Membership Services, in which she claimed that plaintiff "scold[ed] her" about her husband's conduct on the telephone. As a result of the incident, Kaiser placed plaintiff on administrative leave on October 30, 1998, and then discharged him on November 5, 1998. In her deposition,

Mansfield testified that the Doe incident was simply the conclusion of plaintiff's "intolerable demonstration of lack of clinical competence" throughout the course of plaintiff's employment. Plaintiff understandably disputes that his career at Kaiser was marred by clinical incompetence.[12] Plaintiff further contends that he did not challenge Mansfield's judgment in earlier disciplinary proceedings, because he "tried not to be confrontational with [Mansfield] in [his] conversations with her about [his] performance." Thus, he would "agree with her remarks, even when [he] privately disagreed with them."

After plaintiff's suspension, he contacted his friend and attorney Mark Voss for advice. Plaintiff told Voss that Kaiser had not released the Does' complaint to him, and that as a result he did not understand why he was terminated. Plaintiff authorized Voss to contact the Does, hoping that they would agree to be interviewed about their complaint. To this end, plaintiff gave Voss the Does' home telephone number, which plaintiff remembered from his interaction with the Does. Voss subsequently called the Does and left a message on their answering machine, identifying himself as plaintiff's attorney, and indicating that he wished to speak with them about the complaint they had filed against plaintiff. When Mrs. Doe returned Voss's call, Voss told her that he wanted to investigate her complaint as it was the basis of disciplinary action taken against plaintiff. Mrs.

9. Kaiser contends that the exact quote, as remembered by a colleague who claims she overheard the conversation, was, "As an adult male, it would be best if he made his own appointment by himself since he is at work, and not, so to speak, hide behind his wife's skirts."

10. Plaintiff contends that Mrs. Doe called plaintiff back in order to apologize for what she imagined was her husband's harsh words. Plaintiff has also submitted an affidavit in which he argues that the comment about Blue Cross/Blue Shield was in the context of the possibility of obtaining supplemental coverage, and was not a suggestion that the Does drop their health plans with Kaiser altogether.

11. The Termination Letter specifically charges plaintiff with exacerbating Mr. Doe's mental condition. Plaintiff denies that he said anything that should have enraged Mr. Doe, but he does not deny that Mr. Doe was angry, and that his anger was directed at plaintiff.

12. Plaintiff contends that his problems at Kaiser have come about not as a result of his clinical incompetence, but owing instead to the "changing Kaiser rules about who should be referred where and under what circumstances."

Doe told Voss that she preferred not to speak with him about the incident, and that the matter was between plaintiff and Kaiser. Although Voss reiterated that Kaiser was not responding to plaintiff's requests for information, Mrs. Doe still declined to be interviewed. Eventually, Mrs. Doe called Kaiser to complain about Voss's phone call.

Meanwhile, the union, unaware that plaintiff had retained an attorney, filed first a grievance on plaintiff's behalf to challenge the suspension, and then a second grievance when plaintiff was terminated. The union pursued these grievances to a step three meeting,[13] at which the union and Kaiser discussed plaintiff's termination.[14] At that meeting, Kaiser disclosed that plaintiff's counsel had contacted the Does, and that Kaiser considered plaintiff's and Voss's actions a breach of Kaiser's confidentiality policy. Based on this, the union concluded that plaintiff's attorney's contact with Mrs. Doe had damaged plaintiff's chances of prevailing on the grievance,[15] but proceeded nonetheless to press plaintiff's case. Then, in early February 1999, Kaiser offered plaintiff a settlement that included four weeks pay and the opportunity to submit a resignation in lieu of termination. Plaintiff declined the offer and, through the union, submitted a counteroffer, which Kaiser rejected. At that time, the union informed plaintiff that it would not take his case to arbitration. The union's director of member services, Michael Earman, told plaintiff that he had reviewed plaintiff's grievance with an attorney, who had advised that plaintiff's actions in disclosing to his counsel information concerning the Does and, in authorizing counsel to contact the Does, violated

Kaiser's confidentiality policy and would suffice to sustain plaintiff's discharge. Even so, the union submitted another counteroffer on plaintiff's behalf, and when Kaiser rejected it, the union informed plaintiff that if he did not accept Kaiser's initial settlement offer, the union would consider the case closed. Plaintiff again declined and this suit followed. Defendants now seek summary judgment.

## II

On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must do more than "simply show that there is some metaphysical doubt as to the material facts." *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *See Anderson v. Liberty*

13. Step three of the CBA grievance procedure is the last step in which a grievance may be pursued within Kaiser. If the grievance is not resolved at the third step of the process, the union must decide whether it will pursue a grievant's claim to arbitration.

14. The union asked Kaiser's permission to interview witnesses at this meeting, and when Kaiser refused, the union filed a charge of unfair labor practices with the National Labor

Relations Board. Kaiser eventually relented, and allowed the union to interview witnesses.

15. After the step three meeting, Michael Earman, the director of member services for the union and plaintiff's advocate during the grievance procedure, told plaintiff that "based on [the confidentiality breach], they were going to make the discharge stick." He also said "[C]ongratulations. Your attorney just got you discharged."

*Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, in a case in which the nonmoving party bears the burden of proof at trial, as in this case, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

### III

An employee discharged in violation of a collective bargaining agreement may seek relief under § 301 of the Labor Management Relations Act when the union decides not to pursue grievance procedures on the employee's behalf. *See* 29 U.S.C. § 185; *Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In these circumstances, it is well established that such an employee must prove both (i) that the union breached its duty of fair representation of the employee, and (ii) that the employer violated the collective bargaining agreement. *See, e.g., Amburgey v. Consolidation Coal Co.,* 923 F.2d 27, 29 (4th Cir.1991). This rule, as the Fourth Circuit has noted, is based on the federal policy in favor of "adjustment by the parties of disputes arising under a collective bargaining agreement." *Id.* In light of this policy, "federal courts do not invade this domain on the complaint of an employee unless his union is grossly deficient in its representation or recklessly disregards the employee's rights." *Id.* (citation and internal quotation marks omitted). Thus, an employee's claims against the employer and the union "are interlocked: neither claim is viable if the other fails." *Crider v. Spectrulite Consortium, Inc.,* 130 F.3d 1238, 1241 (7th Cir.1997).

16. Indeed, "[i]f the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined." *Vaca,* 386 U.S. at 191, 87 S.Ct.

### A. Breach of duty of fair representation

Analysis properly begins with the question whether plaintiff's claim that the union breached its duty of fair representation survives summary judgment. To prevail on this claim, plaintiff must prove that the "union's conduct is arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. 903; *see Smith v. Local 7898, United Steelworkers of Am.,* 834 F.2d 93, 96 (4th Cir.1987). In deciding whether to pursue an employee's grievance, a union "is granted a 'wide range of reasonableness' so long as it acts with 'complete good faith and honesty of purpose.'" *Smith,* 834 F.2d at 96 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). And in the absence of bad faith or discriminatory intent, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citation omitted). This is a very high standard, and as a result "a violation of the duty of fair representation is not made out by proof that the union made a mistake in judgment," *Smith,* 834 F.2d at 96 (citing *Vaca,* 386 U.S. at 192–93, 87 S.Ct. 903; *Buchanan v. NLRB,* 597 F.2d 388, 394 (4th Cir.1979)). Instead, a union acting in good faith breaches its duty of fair representation in a grievance proceeding only "if it ignores a union member's complaint or represents the member 'in a perfunctory manner.'" *Hypes v. Cyprus Kanawha Corp.,* 40 F.3d 1244, 1994 WL 660695, *3 (4th Cir. Nov.23, 1994) (unpublished disposition) (citing *Vaca,* 386 U.S. at 194, 87 S.Ct. 903). In light of this broad discretion, a union need not pursue every employee's grievance through arbitration. *See Vaca,* 386 U.S. at 191, 87 S.Ct. 903.[16]

903; *see Amburgey,* 923 F.2d at 30 ("A union is its members' representatives, not their puppet, and its duty of fair representation is not a servitude to their individual whims.").

In this case, plaintiff does not dispute that the union was a vigorous advocate from the outset.[17] Instead, he simply disputes the union's decision not to pursue plaintiff's grievance to arbitration. The union contends that it made this decision based in part on plaintiff's work history and in part on plaintiff's decision to authorize his attorney to contact the Does, which the union determined was a breach of Kaiser's confidentiality policy and therefore sufficient to sustain plaintiff's discharge.[18] In the pending motion, plaintiff only challenges the union's conclusion that plaintiff breached Kaiser's confidentiality policy. In that regard, the record reflects that the union's decision was based on its past experience, its understanding of Kaiser's policy, and the advice of counsel.[19] Nonetheless, plaintiff believes that the union's conclusion that plaintiff breached the policy was arbitrary.[20] First, plaintiff argues that the union failed to investigate Voss's phone call to the Does, and instead relied exclusively on Kaiser's version of the event.[21] Plaintiff contends that had union representatives interviewed plaintiff or Voss, the union would have learned (i) that plaintiff did not extract the Doe's telephone number from medical records, because the number was fixed in his memory owing to its similarity to a historical date, and (ii) that the conversation between plaintiff's attorney and Mrs. Doe was brief—the attorney simply "inquired politely" if Mrs. Doe would "consent to be interviewed."

Neither point is persuasive. Plaintiff learned the Does' home telephone number in his capacity as a therapist, and the fact that he recalled it from memory is irrelevant. And the length of the conversation between Mrs. Doe and Voss does not

**17.** The union immediately filed a grievance on plaintiff's behalf to contest his suspension, and then filed a second grievance when Kaiser terminated plaintiff. Further, the union (i) investigated the grievances and discussed them with plaintiff, (ii) attended two grievance meetings with plaintiff and Kaiser, (iii) filed an unfair labor practice charge with the National Labor Relations Board when Kaiser refused to allow the union to interview witnesses, and (iv) obtained a settlement offer from Kaiser (in which plaintiff would receive 160 hours pay and the opportunity to substitute his resignation for involuntary termination). Nor were these halfhearted efforts; plaintiff himself described the union's representation at the grievance proceedings as "brilliant."

**18.** An arbitrator will consider an employee's post-termination actions, if those actions "are but incidents in a single chain of events" related to the conduct that led to termination, and thus it was not inappropriate for the union to rely on the confidentiality breach in assessing plaintiff's case. *See Granite Steel Co.*, 53 Lab.Arb.Rep. 909, 918 (1969) (McKenna, Arb.).

**19.** Earman testified that, in his experience, when a customer complains about an employee, and the employee contacts the customer to inquire about the complaint, the employer generally discharges the employee. Earman further testified that it was his understanding that "confidentiality ... is a big issue in the health care industry," and that as a result

"[t]he policy at Kaiser, to our knowledge, has been uniformly and universally enforced, that you don't take patient information and contact them outside of work to discuss things with them that don't relate to treatment." In addition to Earman's judgment and experience, the union considered the advice of counsel that plaintiff's breach of Kaiser's confidentiality policy would sustain plaintiff's discharge. Although not dispositive, the fact that a union relies on the advice of counsel is significant evidence that the union's decision was not arbitrary. *See, e.g., Washington v. Service Employees Int'l Union, Local 50*, 130 F.3d 825, 827 (8th Cir.1997).

**20.** Plaintiff does not contend that the union acted in bad faith or with discriminatory intent, nor would the record support such contentions.

**21.** A union is required to investigate an employee's grievance only to the extent necessary to uncover the merits of the employee's case. *Compare Carpenter v. West Virginia Flat Glass, Inc.*, 763 F.2d 622, 625 (4th Cir.1985) (holding that a union's failure to interview an employee's doctor was a breach of the duty of fair representation when a primary issue was the employee's physical fitness for work), *with Smith v. McDonnell Douglas Corp.*, 107 F.3d 605, 608–09 (8th Cir.1997) (holding that a union did not have a duty to investigate witnesses who would not be helpful to an employee's case).

change the fact that plaintiff authorized Voss to contact the Does, and that Voss did, in fact, initiate contact with them. Indeed, plaintiff admitted the facts relied on by the union, namely that plaintiff disclosed the Does' telephone number to Voss and authorized Voss to contact them. In the circumstances, the union's conclusion that further investigation was unnecessary was not arbitrary.

Plaintiff next argues that he had a right to retain counsel, but that the union arbitrarily determined that it was improper for plaintiff to do so. This argument misses the mark for there is no evidence that the union told plaintiff he could not retain counsel, or that the union based its decision on the fact that plaintiff retained counsel.[22] Instead, the union based its decision on plaintiff's use of confidential patient information. In the union's judgment, the confidentiality policy prohibited plaintiff from distributing patient information to anyone, including his attorney. Finally, plaintiff argues that his and Voss's actions did not actually violate Kaiser's confidentiality policy. Plaintiff contends he had a right to contact the Does, to learn the nature of their complaint (which Kaiser had not released to plaintiff) and to prepare for possible litigation. Yet plaintiff offers no authority, other than his own belief, to support his contention that Kaiser's refusal to release the Does' complaint gave plaintiff license to use confidential information to contact the Does. In light of these factors, plaintiff's complaint about the union's decision not to proceed to arbitration amounts to no more than a disagreement with the union's judgment, and

it is clear that an employee's disagreement with a union's judgment does not render that judgment arbitrary or irrational.[23] In summary, nothing in the record suggests that the union's decision was arbitrary or irrational. To the contrary, the record reflects (i) that the union was a vigorous advocate for an employee with a weak case, and (ii) that the decision not to arbitrate was entirely rational in light of plaintiff's actions and the union's experience. For that reason, summary judgment is appropriate for both Kaiser and the union.

### B. "Just cause" for termination

Even assuming plaintiff has shown that the union breached its duty of fair representation, he cannot prevail on his § 301 claim unless he also carries his burden of showing that Kaiser violated the CBA when it terminated plaintiff. *See Vaca*, 386 U.S. at 190, 87 S.Ct. 903. In this case, plaintiff contends that he was terminated without "just cause," which the CBA specifically prohibits.[24] As a preliminary matter, it is well-established that federal common law, rather than state law, governs the construction of the terms of a collective bargaining agreement. *See Textile Workers Union of Am. v. Lincoln Mills of Alabama*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Hence, courts in § 301 cases must assess termination challenges under a federal standard as to what constitutes "just cause." And in this regard, it is settled that "[j]ust cause is a flexible concept, embodying notions of equity and fairness." *Crider*, 130 F.3d at 1242 (citation and internal quota-

---

22. The record reflects the contrary. Significantly, there is no dispute that the union never objected to plaintiff's retention of counsel and indeed the union continued to represent plaintiff vigorously for several months after it learned of plaintiff's retention of counsel. And while Earman testified that an employee's attorney is not allowed to participate in the grievance process (because under the CBA the union is the employee's exclusive bargaining agent, *see Moore v. Duke Power Co.*, 971 F.Supp. 978, 984 (W.D.N.C.1997) (refusal to allow employee's attorney to participate in arbitration was not breach of duty

of fair representation)), he also testified that an employee certainly has the right to consult an attorney.

23. *See, e.g., Miller v. Publishers Paper Co.*, 131 L.R.R.M. (BNA) 2578, 1996 U.S.Dist. LEXIS 20162, at *14 (D.Ore. September 19, 1986) (noting that disagreement with a union's decision is not enough to overcome presumption of reasonableness).

24. The CBA states, "No employee within the unit shall be discharged, suspended, or otherwise disciplined except for just cause."

tion marks omitted). In other words, "just cause" is simply "what is fair and reasonable, when all of the applicable facts and circumstances are considered." *Hiram Walker & Sons, Inc.*, 75 Lab.Arb.Rep. (BNA) 899–900 (1980) (Belshaw, Arb.). Thus, the question presented in a § 301 termination challenge is not whether the employer made the best decision or used good business judgment in deciding to terminate an employee, but rather whether the decision was fair and reasonable in the circumstances. In short, the issue is whether the claimant received a "fair shake." *See id.* And importantly, "[w]hether the undisputed facts of a particular case establish just cause is a question of law for the court." *Crider*, 130 F.3d at 1242.

■ These principles applied here compel the conclusion that Kaiser's termination decision was fair and reasonable given plaintiff's history of generating complaints from patients and colleagues alike, and his lack of sound clinical judgment when handling the Does' calls. It is undeniable that Kaiser hired plaintiff based on his clinical experience and education, and reasonably expected him to exercise sound clinical and professional judgment when handling calls from patients. Yet, the record confirms this expectation was not met. With respect to the Doe incident, Kaiser reasonably concluded that a clinician exercising proper judgment would have permitted Mrs. Doe to schedule an appointment on behalf of her husband, who was reported as acting "crazy" and was known to be suffering from a manic depressive or bipolar disorder. And quite apart from plaintiff's decision not to schedule an appointment, Kaiser reasonably concluded that a clinician exercising proper judgment would not have made the comments to Mrs. Doe to the effect that the Kaiser health plan was a Ford, that Mr. Doe should take responsibility for his own health and not hide behind Mrs. Doe, and that Blue Cross/Blue Shield might provide the scope of services sought by the Does.

Nor was the Doe incident an isolated event; Kaiser not unreasonably viewed it as simply another example of plaintiff's poor professional judgment.[25] Plaintiff's work record was marked and marred by a series of complaints, poor performance evaluations, supervisories, and two written warnings, most of which implicated his clinical and professional judgment and his ability to carry out the basic requirements of his job. Of particular relevance is the incident in which plaintiff broke contact with a suicidal caller. In that case, plaintiff asked the caller if she was "safe for the time being while I try to get you some help." When she answered in the affirmative, he placed the phone on the desk so that he could call her doctor. The patient hung up and would not respond to calls made to her house. In his deposition, plaintiff agreed that a clinician should know not to break contact with a suicidal caller, but he argued that he did not break contact, as he did nothing more than put the telephone down temporarily and did not place her on hold. Yet, there is plainly no difference between placing a caller on hold and laying the handset down; in both circumstances, communication is broken, and the fact that plaintiff refused to acknowledge his error lends weight to the reasonableness of Kaiser's concerns.[26]

---

**25.** The fact that an employee repeats conduct about which he is warned is evidence that just cause for termination exists. *See, e.g., General Electric Co.*, 70 Lab.Arb.Rep. (BNA) 1174, 1176 (1978) (Abrams, Arb.) ("This is not the case of a long-time employee with a late developing problem which might be cured by one more try.... The Company has given Grievant every opportunity to improve and every counseling required.").

**26.** The other incidents in the first written warning and the final written warning support the reasonableness of Kaiser's concerns. According to those warnings, the substance of which plaintiff has not disputed, plaintiff erroneously told a woman who was having a severe reaction to her medication that she did not qualify for urgent care because she was not suicidal, told an upset patient that "men get scared when women are angry," refused to schedule therapy for a girl who had been sexually abused on the ground that the mother had not yet contacted child protective services, and misunderstood a patient's request

Further support for the reasonableness of Kaiser's decision to discipline and finally terminate plaintiff is found in the fact that Kaiser provided plaintiff with ample opportunity to correct his behavior, receive training, and improve his skills. In this regard, Kaiser's employee handbook provides for "progressive discipline" to correct an employee's performance problem, including the use of "counseling, verbal warnings, written warnings, suspension and/or termination," and the record reflects that precisely this progression of discipline occurred here.[27]

Plaintiff's arguments to the contrary are unpersuasive. He simply claims that his record of progressive discipline did not implicate his clinical judgment. With respect to the Doe incident, plaintiff contends that he was simply following the Kaiser policy on scheduling appointments, according to which patients must schedule their own appointments unless for some reason they are unable to do so, and that he did not have reason to believe that Mr. Doe's condition fit one of the exceptions to this general rule. Plaintiff also contends that he said nothing to Mrs. Doe which was inappropriate in the course of their conversation. Yet, significantly at this stage of the litigation, plaintiff has offered nothing beyond his own self-serving affidavit to suggest that Kaiser was in error by reaching the opposite conclusion on each of these points.[28] The record thus reflects that Kaiser reasonably concluded that

plaintiff was not meeting its standards, gave plaintiff several opportunities to adjust his performance, and terminated him only after it was clear that plaintiff would not meet Kaiser's reasonable expectations. In short, Kaiser gave plaintiff a "fair shake,"[29] and summary judgment is appropriate on this ground as well.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record. An appropriate order will enter.

---

for therapy as a request for a medication evaluation.

**27.** Arbitrators routinely consider the fact that an employee was on notice of his employer's concerns, whether the notice was in the form of verbal or written warnings, complaints, or other methods of "progressive discipline," in determining whether an employer had just cause to terminate an employee. *See Champion Dairypak,* 105 Lab.Arb.Rep. (BNA) 462, 464 (1995) (Allen, Arb.) (noting that an employer had just cause to terminate an employee in part because the employee did not respond to the employer's progressive discipline); *Trendler Metal Prods.,* 101 Lab.Arb.Rep. (BNA) 749, 754–55 (1994) (Green, Arb.) (same); *Cosco Fire Protection,* 91 Lab.

Arb.Rep. (BNA) 593, 595 (1988) (Koven, Arb.) (same).

**28.** In the absence of any evidence that plaintiff's supervisor was in error, the fact that plaintiff disagreed with his supervisor's appraisal of his job performance is evidence that plaintiff simply refused to be reformed. *See, e.g., Southwestern Bell Telephone Co.,* 102 Lab.Arb.Rep. (BNA) 531, 533 (1994) (Nolan, Arb.) ("If the Grievant really believed she was right and everyone else was wrong, she had little reason to want to change her style [of dealing with customers].").

**29.** *See Hiram Walker & Sons, Inc.,* 75 Lab. Arb.Rep. (BNA) at 900.